FIRST NATIONAL BANK OF THE
NORTH, Respondent,

v.

AUTOMOTIVE FINANCE
CORPORATION,
Appellant,

J. Doe I–III, Defendants.

No. C3–02–1894.

Court of Appeals of Minnesota.

May 27, 2003.

Ralph L. Moore, Stein & Moore, P.A., St. Paul, MN, for respondent.

Paul L. Ratelle, Michael A. Rosow, Fabyanske, Westra & Hart, P.A., Minneapolis, MN, for appellant.

Considered and decided by TOUSSAINT, Chief Judge, LANSING, Judge, and HUSPENI, Judge.*

## OPINION

LANSING, Judge.

This appeal in a replevin action involves a dispute between a consumer lender and a defaulting dealer's flooring lender over the priority of security interests in three vehicles. The district court determined as a matter of law that the consumer lender's security interest in each vehicle is superior to the security interest held by the flooring lender. The flooring lender appeals the summary judgment granted the consumer lender, and we affirm.

## FACTS

Automotive Finance Corporation (AFC) is a nationwide flooring lender that entered into a financing arrangement with Scott Ferrozzo individually and doing business as Shakopee Used Cars and Trucks (the dealer). Under the terms of the financing arrangement, AFC agreed to lend the dealer $100,000 for the purchase of vehicles for its inventory. In exchange, the dealer granted AFC a security interest in the dealer's inventory, including all vehicles owned or acquired by the dealer in the future. AFC perfected its security interest by filing a financing statement with the Minnesota Secretary of State, as required by the Uniform Commercial Code. Minn. Stat. § 336.9–310(a) (2002).

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

The dealer sold three vehicles in its inventory to individual buyers. Each of the buyers financed the purchase through a loan with First National Bank of the North (the bank). The bank secured repayment of the loans by taking a security interest in each of the vehicles, which it duly noted on the certificates of title. *See* Minn.Stat. § 168A.17, subd. 1 (2002) (prescribing procedures for perfecting security interest in vehicles). The bank appears as the first secured party on the vehicle title.

Shortly after each of the transactions was completed, the dealer defaulted on its loan to AFC, and each of the borrowers defaulted on his loan to the bank. At some point, each borrower "traded in" his vehicle to the dealer in exchange for a new vehicle. Neither the borrowers nor the dealer, however, paid off the loans to the bank. Before the bank could physically repossess the vehicles that secured each loan, AFC repossessed the dealer's inventory in satisfaction of its financing arrangement with the dealer. The repossessed inventory included the trade-in vehicles that secured the bank's loans.

The bank brought a replevin action to recover the vehicles. Both the bank and AFC moved for summary judgment, each claiming that its interest was superior. The district court granted the bank's motion for summary judgment, and AFC now appeals.

## ISSUE

Does a consumer lender's valid security interest, noted on a vehicle's certificate of title and perfected under Minn.Stat. § 168A.01–.31 (2002), take priority over a flooring lender's security interest in the inventory of a defaulting dealer?

## ANALYSIS

■■ A summary judgment based on application of a statute to undisputed facts is a legal determination that we review de novo. *Wiegel v. City of St. Paul,* 639 N.W.2d 378, 381 (Minn.2002). To determine whether a statute has been correctly applied, we focus on the words of the statute to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2002). If the meaning is plain and unambiguous we apply that meaning as a manifestation of legislative intent. *Kersten v. Minn. Mut. Life. Ins. Co.,* 608 N.W.2d 869, 874–75 (Minn.2000). Plain meaning embodies ordinary use of the language in the context of the whole-act structure, applying the usual conventions of grammar and syntax. *Occhino v. Grover,* 640 N.W.2d 357, 359, *review denied* (Minn. May 28, 2002). If the meaning of statutory language is not plain, we resolve ambiguity by looking to other factors that evince legislative intent and, when applicable, agency interpretation and extrinsic-source canons. *Id.* at 360; Minn.Stat. § 645.16 (listing factors for ascertaining legislative intent).

In general, a financing statement must be filed under the Uniform Commercial Code to perfect a security interest. Minn. Stat. § 336.9–310(a) (2002). The code, however, creates specific exceptions from the financing-statement requirements, which include security interests in a vehicle for which a certificate of title is required. Minn.Stat. §§ 336.9–310(a), –310(b)(3), –311(a)(2) (2002). A security interest in a vehicle for which a certificate of title is required is perfected under chapter 168A and this method of perfecting a security interest in a vehicle subject to the act is exclusive. Minn.Stat. § 168A.22 (2002); *CECO Corp. v. United States,* 554 F.Supp. 569, 572 (D.Minn.1982).

■■ The function of chapter 168A is to outline a single filing procedure for the notation of ownership and security interests in vehicles on the certificate of title.

*See Bank N. v. Soule,* 420 N.W.2d 598, 602 (Minn.1988) (noting that system of single filing was designed to protect all parties in commercial transactions involving the vehicle); *see also Carousel Autos., Inc. v. Gherity,* 527 N.W.2d 813, 815 (Minn.1995) (noting that single filing procedure provided "reliable and verifiable" record of motor-vehicle ownership). Under this unified system, parties to a commercial transaction, whether a sale or a security arrangement, may rely with "practical certitude" on the ownership and security interests inscribed on the certificate of title. *Soule,* 420 N.W.2d at 602. To perfect a security interest in a vehicle that requires a certificate of title, the secured party must note its security interest on the certificate through the perfection rules prescribed in Minn.Stat. § 168A.17 (2002). Unless perfected under the procedures prescribed in sections 168A.01 to .31, or excepted under section 168A.16, a security interest in a vehicle for which a certificate of title is required is not valid. Minn.Stat. § 168A.17, subd. 1.

A dealer who owns a vehicle that is held for sale is exempted from the act and is therefore not required to obtain a certificate of title for that vehicle. Minn.Stat. § 168A.03(2) (2002). Because the dealer is not covered under the motor-vehicle-certification procedures, a security interest in the dealer-held vehicle is perfected through the general Uniform Commercial Code process of filing a financing statement with the Minnesota Secretary of State, rather than through chapter 168A procedures. Minn.Stat. §§ 336.9–310(a), –311(d) (2002). To provide for the exception from the motor-vehicle-certification procedures, Minn.Stat. § 168A.16(a)(3) states:

(a) Sections 168A.01 to 168A.31 do not apply to or affect
* * * *

(3) a security interest in a vehicle created by a manufacturer or dealer who holds the vehicle for sale.
Minn.Stat. § 168A.16(a)(3).

■ It is this provision on which AFC relies for its argument that its security interest has priority over the bank's on the three vehicles. AFC claims that when the vehicles were traded in they were once again owned by a dealer who was holding them for sale and thus became subject to its inventory lien. According to this argument, the bank's security interest, even though preceding the reinstated inventory lien, cannot "apply to or affect" its later lien because of the express language of Minn.Stat. § 168A.16(a)(3). The unstated but necessary implication of AFC's claim is that a consumer lender's perfected security interest is always nullified by Minn.Stat. § 168A.16(a)(3) when borrowers trade in their vehicles to a dealer who has granted a security interest in its inventory. We disagree with AFC's interpretation for several reasons.

AFC's argument expands the statutory language to provide, in effect, that *security interests perfected under* sections 168A.01 to 168A.31 do not apply to or affect security interests in vehicles created by dealers who held the vehicles for sale. But that is not what the statute says. Rather the statute states that *sections 168A.01 to 168A.31* do not apply to or affect the dealer's security interest. This language must be read in the context of the whole act.

The plain meaning of "do[es] not apply to or affect," within the context of the act, is to provide an exception from the certificate-of-title requirements for security interests created by the dealer who holds the vehicle for sale. Consistent with the statutory provision exempting the dealer from obtaining a certificate of title for every vehicle in its inventory and correspondingly noting on each certificate a se-

cured interest in the inventory, the act excepts the dealer's inventory lien because it is included under the Uniform Commercial Code's financing statement provisions. Minn.Stat. §§ 336.9–310(a), –311(d). To read section 168A.16(a)(3) in the way that AFC advances would not only contradict the internal structure of the act, but also conflict with its specific provisions, most significantly, the statement that the act is the exclusive means of perfecting a security interest for vehicles covered by the act. Minn.Stat. § 168A.22 Consistent with this exclusivity, the act contains no provision or suggestion that a consumer lender who wishes to maintain a security interest after the vehicle is traded in, must file a UCC financing statement.

■ Not only does the plain meaning within the context of the act compel this reading of section 168A.16(a)(3), but the meaning also conforms to another principle, fundamental to the Uniform Commercial Code, that a transferee of goods acquires no greater rights than those of his transferor. A security interest can only attach and become enforceable when the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party. Minn.Stat. § 336.9–203(b)(2) (2002). In this case, the "debtor" dealer never received a right to *title* of the vehicles. At most, the dealer received a right to *possess* the vehicles because possession is all the bank's borrowers were entitled to transfer without the bank's consent. In other words, when the dealer accepted the trade ins from the borrowers, it gained no greater rights than those of the borrowers. *See* Minn.Stat. § 336.2–403(1) (2002) (purchaser generally acquires only such title as his transferor had); *see also* Minn.Stat. § 336.9–319(a) (2002) (during consignment of goods, consignee is deemed to have rights and title to goods

identical to those the consignor had or had power to transfer).

AFC made a similar argument that its security interest took priority over a consumer lender's security interest in a federal bankruptcy action involving strikingly similar facts. *See In re Kincaid,* 218 B.R. 965 (Bankr.W.D.Wash.1998). Based on the language of Washington's Uniform Commercial Code, AFC argued that a consumer lender's financing statement became "unperfected" upon trade in of the vehicle, and that a consumer lender needed to file a financing statement to continue its security interest after trade in. *Id.* at 967. The federal bankruptcy court rejected AFC's argument, specifically recognizing the importance of the notice filing system in allocating burdens to parties who could best shoulder them. *Id.* at 968. The bankruptcy court noted that adopting an interpretation similar to the one suggested by AFC would "lead to the result that lenders would have no way to protect themselves against flooring lenders * * * [because] the consumer lenders' customers could always defeat the consumer lenders' perfected security interests by trading in or consigning the vehicle to a dealer with a flooring financing statement on file." *Id.*

AFC contends that the bank in this case could rely on means other than the certificate-of-title statutes to protect its security interests. For instance, AFC suggests that consumer lenders could assume the burden of monitoring their collateral, just as flooring-plan lenders protect their interests in dealership inventories. This argument, however, fails to recognize the significant difference between monitoring inventories that are located on a single dealership lot and monitoring vehicles located at scattered individual homes. This approach would defeat the code's purpose of bringing the security interests under a uniform notice-filing system, which allo-

cates burdens to those best in a position to shoulder them. AFC similarly suggests that the bank has recourse against its customers and should not take recourse against AFC as an innocent third party. But, again, this argument ignores a basic purpose of the certification system—to protect consumer lenders and reduce unnecessary costs to both consumer lenders and borrowers.

Furthermore, AFC's arguments assume that the three vehicles were properly transferred to the dealer and that its security interest attached to each vehicle. A transfer of a vehicle by an owner, however, is not effective until the owner has complied with section 168A.10. Minn.Stat. § 168A.10, subd. 5 (2002). An owner who validly transfers an interest in a vehicle is required to execute an assignment and warranty of title to the transferee. *Id.* Although dealers who buy vehicles to hold for resale and who obtain the certificate of title from the owner or secured party are excepted from applying for a new certificate of title, they are not excepted from obtaining the original certificate of title. Minn.Stat. § 168A.11, subd. 1 (2002). AFC's defaulting dealer could not obtain a certificate of title to any of the vehicles without the consent of the bank as the first secured party. Because the vehicles were apparently improperly transferred to the dealer, Minn.Stat. § 168A.16(a)(3) would not apply because AFC's security interest in the vehicles did not attach.

■ Finally, we note that the express terms of the original financing arrangement between AFC and the dealer fail to support AFC's argument that it possessed a security interest in the three vehicles. Under the financing agreement, AFC held a security interest in the "Collateral" as defined in section 1.4. The covered "Collateral" includes "all *Vehicles,* vehicle parts, and other inventory now owned or hereafter acquired, including, without limitation, the Purchase Money Inventory, * * * and all additions, accessions, accessories, replacements, and proceeds thereof." (Emphasis added.) "Vehicles" is a defined term in the financing agreement and it includes "Vehicle[s], the ownership of which is embodied in a Title." In section 6.7 of the agreement, AFC required the dealer to warrant that it had "made all filings, recordations, and taken all necessary actions (including registration on a certificate of title) which are required to perfect Dealer's interest with respect to the Collateral."

By the terms of its own financing agreement, AFC acknowledges that the dealer must hold title to the vehicles on its lot for the vehicles to constitute collateral. Although AFC might have been entitled to the excess proceeds of the sale of the vehicles after the bank's security interest had been satisfied, AFC's security interest does not extend to a vehicle for which the dealer itself did not hold title. AFC may choose to pursue other remedies for the dealer's failure to obtain title to the vehicles which were held for sale on its lot, but it cannot use Minn.Stat. § 168A.16(a)(3) to defeat the bank's priority perfected security interest.

## DECISION

A consumer lender whose security interest in a vehicle has been perfected under chapter 168A retains that interest when the vehicle becomes inventory of a dealer through a trade in, and Minn.Stat. § 168A.16(a)(3) does not require that the interest be protected by filing a U.C.C. financing statement.

**Affirmed.**