**STATE of Minnesota, Respondent,**

v.

**Jakklyn M. NETLAND, Appellant.**

**No. A06–1511.**

Court of Appeals of Minnesota.

Dec. 11, 2007.

---

**210**

Charles A. Ramsay, Sharon R. Osborn, Ramsay & DeVore, Roseville, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Andrew R. Small, Assistant City Attorney, Minneapolis, MN, for respondent.

Considered and decided by WRIGHT, Presiding Judge; SHUMAKER, Judge; and STONEBURNER, Judge.

## OPINION

WRIGHT, Judge.

Appellant challenges her conviction of second-degree driving while impaired for

refusal to submit to a chemical test, arguing that (1) imposing criminal penalties for refusing to submit to chemical testing unconstitutionally conditions the privilege of driving on the driver's surrender of rights guaranteed by the Fourth Amendment to the United States Constitution; (2) a conviction of driving while impaired for "refusing" to submit to a breath test based on the Intoxilyzer machine's rejection of her breath samples, despite her apparent willingness to provide one, and the officer's rejection of her timely requests for additional opportunities to complete the Intoxilyzer test and an alternate method of testing, violates the right to due process; (3) the district court erred in denying her motion for a mistrial; and (4) admitting the results of an incomplete breath test was prejudicial error. We reverse the conviction on due-process grounds.

## FACTS

Appellant Jakklyn Netland[1] was charged with one count of third-degree driving while impaired(DWI), a violation of Minn.Stat. § 169A.20, subd. 1(1) (2004), and one count of second-degree DWI for refusal to submit to a chemical test (test refusal), a violation of Minn.Stat. § 169A.20, subd. 2 (2004). Following a jury trial, Netland was acquitted of third-degree DWI but found guilty of test refusal.

In the early morning of January 7, 2006, Officer Dennis Hagen arrested Netland for DWI. Netland does not dispute that Officer Hagen had probable cause for doing so. At the police department, Officer Hagen asked Netland to submit to a breath test under Minn.Stat. § 169A.51 (2004).

---

1. Although the district court caption spells Netland's first name "Jacqueline," Netland's trial testimony indicates that she spells her first name "Jakklyn." Accordingly, we use the spelling provided in Netland's testimony.

He read Netland the "Motor Vehicle Implied Consent Advisory" form, which informed her that (1) Minnesota law requires her to submit to chemical testing; (2) refusal to take a test is a crime; (3) she has the right to consult with an attorney before deciding whether to be tested; and (4) she will be deemed to have refused if the test is unreasonably delayed or if she refuses to make a decision. After reading each of the four parts of the advisory, Officer Hagen asked Netland if she understood that portion of the form. Neltand replied, "Yes" to each.

Netland invoked her right to an attorney. The attorney who spoke with her advised her to take the test, stating, "Whatever you do, do not refuse the test. It's way worse than coming up with a positive." According to Netland, this advice "freaked out" Netland, who testified that she had never heard of the implied-consent law. As a result of the advice, Netland testified, "I wanted to take the test and I wanted it to be over."

After Netland hung up the telephone, Officer Hagen asked if she would submit to a breath test. Because Netland said that she would, Officer Hagen led her to the Intoxilyzer 5000 (Intoxilyzer), which was ready for operation. According to the expert testimony, the Intoxilyzer has specific parameters that a breath sample must meet in order to be analyzed. First, the test subject must activate the machine's internal sequence by blowing into the mouthpiece at an overall rate of at least 0.175 liters of air per second. This triggers an audible tone, which indicates that the Intoxilyzer is analyzing the sample. But for the Intoxilyzer to accept the breath sample as sufficient, the subject must maintain a flow of at least 0.15 liters of air per second. The tone will continue uninterrupted if the subject maintains this airflow rate. Dropping below 0.15 liters

per second interrupts the tone, thereby indicating a "deficient sample" and requiring the subject to start over. The Intoxilyzer will accept a breath sample as "adequate" once the subject has provided a total volume of at least 1.1 liters of air after maintaining a continuous tone. And although the Intoxilyzer records the number of attempted samples a subject provides, it does not record the specific reason for each breath sample it rejects.

An audio recording of Netland's Intoxilyzer test was a focal point of the trial. Officer Hagen instructed Netland to blow into the Intoxilyzer and told her that she would hear a tone once she started. He also told Netland that she "need[ed] to keep the tone going." According to the printout of test results, Netland made 19 attempts in fewer than three minutes and 30 seconds before Officer Hagen terminated the test. The audio recording conclusively establishes that Netland blew into the Intoxilyzer hard enough to sustain a number of tones, although it is difficult to tell whether some of these tones are long, continuous tones or a series of short tones with barely perceptible interruptions. It does not appear that the Intoxilyzer accepted any of these attempts, although the printout shows the total volume of only the last of these attempts.

Officer Hagen advised Netland that he considered her test performance to be a refusal, variously explaining that he felt Netland was "obviously not trying" and "playing games," and that it was the Intoxilyzer that "deemed" Netland's deficient samples as a refusal. Netland repeatedly insisted that she was not refusing, explained that she was having trouble sustaining a tone for the requisite length of time, and asked to be given additional opportunities to blow into the Intoxilyzer.

Shortly thereafter, Officer Hagen ended the breath test and advised Netland that

she would be charged with test refusal. Insisting that she was not refusing, Netland asked to be permitted to submit a blood or urine sample. But Officer Hagen denied the request. Officer Hagen testified that it was his common practice to offer a breath test rather than a blood or urine test because the breath test is immediately available and produces an immediate test result. Officer Hagen also testified that, although Netland specifically told him that she would be willing to take a blood or urine test, he "felt she wasn't trying ... [to] giv[e] a valid, long breath" and declined to offer an alternative test because "it would lead to ... charging her with a test refusal." Undeterred, Netland hired an independent tester to obtain and analyze a urine sample that she submitted, which subsequently measured her alcohol concentration to be 0.036.

At trial, Officer Hagen testified that he "felt [Netland] wasn't trying to give a[n] appropriate sample" because she did not blow hard enough or long enough for the Intoxilyzer to register a valid breath sample. Netland testified that she has difficulty breathing under stress, and she was under particular stress because she could not get the Intoxilyzer to register her breath samples. Netland repeatedly denied refusing to take the test.

Regarding what constitutes a "test refusal," the jury was instructed that the state must prove that "the defendant was requested by a police officer to submit to a chemical test of [her] breath" and "refused to submit to the test." During deliberations, the jury requested a cassette player to "listen to the evidence," referring to the audio recording of the Intoxilyzer test. The jury's note emphasized that "[t]his is a must." The tape was played once more in the courtroom. Although the jury acquitted Netland of the DWI charge, it found

her guilty of refusing to submit to the Intoxilyzer test. This appeal followed.

## ISSUES

I. Does criminalizing refusal to submit to a chemical test violate the Fourth Amendment's prohibition against unreasonable searches?

II. Does due process permit a test-refusal conviction when the officer terminated an in-progress breath test because the Intoxilyzer rejected the defendant's breath sample and the officer denied the defendant's insistent requests for additional and alternative forms of chemical testing?

III. Did the district court abuse its discretion by denying the defendant's motion for a mistrial?

IV. Did the district court abuse its discretion by admitting evidence of the partial Intoxilyzer test results?

## ANALYSIS

Netland challenges her conviction of second-degree DWI for refusing to submit to chemical testing (test refusal), a violation of Minn.Stat. § 169A.20, subd. 2 (2004). Under that section, "[i]t is a crime for any person to refuse to submit to a chemical test of the person's blood, breath, or urine under section 169A.51 (chemical tests for intoxication), or 169A.52 (test refusal or failure; revocation of license)." *Id.* Netland's challenge is founded primarily on two constitutional arguments: (1) that section 169A.20, subdivision 2, is unconstitutional on its face because it requires a surrender of the Fourth Amendment protection against unreasonable searches and seizures as a condition of driving in Minnesota; and (2) that constitutional due-process guarantees of fundamental fairness prohibit convicting Netland of "refusing" to submit to a chemical test that she was

attempting to take and seeking an alternative means of administration. Although we reject Netland's facial challenge to the statute, a thorough review of the record convinces us that Netland was denied the guarantees of procedural due process.

## I.

██ Netland argues that Minn.Stat. § 169A.20, subd. 2, which makes it a crime for a driver to refuse to submit to chemical testing for the presence of alcohol, unconstitutionally conditions the privilege of driving on the surrender of rights guaranteed by the Fourth Amendment to the United States Constitution. The constitutionality of a statute presents a question of law, which we review de novo. *State v. Melde,* 725 N.W.2d 99, 102 (Minn.2006). In doing so, we presume that Minnesota statutes are constitutional and will strike down a statute as unconstitutional only if absolutely necessary. *Id.* The party challenging the constitutionality of a statute must "demonstrate [ ] beyond a reasonable doubt that the statute violates some constitutional provision." *Miller Brewing Co. v. State,* 284 N.W.2d 353, 356 (Minn.1979).

Under Minnesota's implied-consent law, any person who drives a motor vehicle within the state consents to have her or his blood, breath, or urine chemically tested for the purpose of determining the presence of alcohol. Minn.Stat. § 169A.51, subd. 1(a) (2004). An officer may require a person to submit to chemical testing if there is probable cause that the person was driving while under the influence of alcohol and has been lawfully placed under arrest for doing so. *Id.,* subd. 1(b)(1) (2004). A person who refuses to submit to a properly requested test is subject to both civil and criminal penalties. Minn.Stat. §§ 169A.52, subd. 3(a) (revoking driving privileges for one year upon test refusal), 169A.20, subd. 2 (making test refusal a

crime), 169A.25–169A.26 (penalizing criminal test refusal as gross misdemeanor) (2004).

██ At the same time, it is well-established that a state-created privilege "cannot be made to depend upon the surrender of a right created and guaranteed by the federal Constitution." *Frost v. R.R. Comm'n,* 271 U.S. 583, 596, 46 S.Ct. 605, 608, 70 L.Ed. 1101 (1926). Chemical testing under the implied-consent law constitutes a "search" within the meaning of the Fourth Amendment. As such, any consent to be searched that is obtained "must be received, not extracted." *State v. Dezso,* 512 N.W.2d 877, 880 (Minn.1994); *see also In re Welfare of J.W.K.,* 583 N.W.2d 752, 755 (Minn.1998) (applying Fourth Amendment protections to physical act of drawing blood and medical data obtained from subsequent chemical analysis). Netland argues that the legislature has improperly conditioned the privilege of driving on surrendering one's right to refuse consent to a warrantless search by imposing criminal penalties on one who exercises the right to refuse.

██ Both the United States and Minnesota constitutions protect an individual's right to be free of unreasonable searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Generally, a warrantless search is "unreasonable" per se. *State v. Hanley,* 363 N.W.2d 735, 738 (Minn.1985). The "overriding function" of this constitutional guarantee is to "protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). But this constitutional guarantee does not protect against all intrusions. Rather, it protects only against unreasonable intrusions or searches "which are not justified in the circumstances, or which are made in an

improper manner." *Id.* at 768, 86 S.Ct. at 1834. Thus, the general rule that only searches pursuant to a warrant are "reasonable" is subject to several "specifically established and well delineated exceptions." *Hanley*, 363 N.W.2d at 738 (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)).

■ An individual's consent to be searched is a well-settled exception to the warrant requirement. *Id.* To be valid, such consent must be "freely and voluntarily" given. *State v. George*, 557 N.W.2d 575, 579 (Minn.1997). Although "an officer has a right to ask to search[,] ... an individual has a right to say no." *Id.* Because an individual does not have the right to say no to a chemical test and, indeed, is subject to criminal penalties for doing so, the "consent" implied by law is insufficiently voluntary for Fourth Amendment purposes. *Cf. State v. Mellett*, 642 N.W.2d 779, 785 (Minn.App.2002) (acknowledging that criminalizing refusal is a "means of coercion"), *review denied* (Minn. July 16, 2002). But voluntary consent is not the only exception to the warrant requirement.

■ The presence of "exigent circumstances" also is an exception that can justify an otherwise unreasonable warrantless search. *State v. Johnson*, 689 N.W.2d 247, 251 (Minn.App.2004), *review denied* (Minn. Jan. 20, 2005). Exigent circumstances exist when there is a danger of the imminent destruction of evidence. *State v. Shriner*, 739 N.W.2d 432, 436 (Minn.App.2007). For that reason, the "evanescent quality" of alcohol in an allegedly impaired driver's blood may present an exigent circumstance. *See id.* at 436, 438 (declining to adopt rule that evanescent quality of alco-

hol establishes exigent circumstances per se and holding that exigent circumstances of implied-consent search depends on totality of circumstances); *see also Schmerber*, 384 U.S. at 770–71, 86 S.Ct. at 1835–36 (stating that "the percentage of alcohol in the blood begins to diminish ... as the body functions to eliminate it from the system").

Thus, contrary to Netland's argument, the State of Minnesota does not condition a person's driving privileges on surrendering a constitutional right. Before "the [chemical] test may be required of a person," the implied-consent law requires the requesting officer to have probable cause to believe a person is driving while impaired. Minn.Stat. § 169A.51, subd. 1(b). And if, as it often will be, a warrantless search is necessary to prevent evidence of the driver's intoxication from imminent destruction by physiological processes, the exigent-circumstances exception authorizes the search. *See Shriner*, 739 N.W.2d at 439 (emphasizing that "the exigent-circumstances requirement is not a high threshold"). Since the Fourth Amendment does not grant the right to refuse a search supported by probable cause and authorized by exigent circumstances, the implied-consent law does not require a driver to surrender the right to be free from unreasonable searches.[2]

Moreover, section 169A.20, subdivision 2, does not criminalize withholding "consent," implied or otherwise, to being searched. Rather, it criminalizes "refus[ing] to *submit*" to a search, supported by probable cause, in which the body's natural physiological processes make the destruction of evidence imminent. Under these circumstances, whether the driver consents to the

---

2. This clarifies our implicit reasoning in *Mellett*, which upheld the criminal-refusal statute against another Fourth Amendment chal-

lenge. *See* 642 N.W.2d at 783 n. 2, 785 (citing *Schmerber*, 384 U.S. at 757, 86 S.Ct. at 1826).

test is wholly irrelevant because "reasonableness," not "consent," is the necessary condition under which chemical testing withstands a constitutional challenge. Because Minn.Stat. § 169A.20, subd. 2, neither authorizes an unreasonable search nor conditions a privilege on surrendering a constitutional right, Netland's challenge to the constitutionality of this statute fails.

## II.

■■■ Netland also challenges her conviction as a violation of due process. She argues that it is fundamentally unfair to convict her of test refusal when she was imploring Officer Hagen for an opportunity to take an alternative test. Whether the facts establish a violation of due process presents a question of constitutional law, which we review de novo. *Bendorf v. Comm'r of Pub. Safety*, 727 N.W.2d 410, 413 (Minn.2007).

■■■ The constitutional right to due process requires a person accused of a crime to "be treated with fundamental fairness" and "afforded a meaningful opportunity to present a complete defense." *State v. Quick*, 659 N.W.2d 701, 712 (Minn.2003) (citing U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7). "Due process of law is a summarized constitutional guarantee of respect for those personal immunities which ... are so rooted in the traditions and conscience of our people as to be ranked as fundamental or are implicit in the concept of ordered liberty." *Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) (quotations omitted). Because due process of law is "a historic and generative principle," it eludes any definition more precise than the simple idea "that convictions cannot be brought about by methods that offend a sense of justice." *Id.* at 173, 72 S.Ct. at 210 (quotation omitted).

■■■ A criminal conviction for test refusal violates due process if the circumstances of the requested test and alleged refusal are fundamentally unfair. *Cf. Melde*, 725 N.W.2d at 103 ("a misleading implied consent advisory violates federal due process"); *State v. Polsfuss*, 720 N.W.2d 1, 4 (Minn.App.2006) ("It is a violation of fundamental fairness when a breath test is obtained through coercion."). Netland argues that convicting her for "refusing to submit" to Officer Hagen's request for chemical testing is fundamentally unfair because (1) she took the Intoxilyzer test, but Officer Hagen "deemed" her failure to provide an adequate sample a refusal; (2) Officer Hagen terminated the test early because he "felt she wasn't trying" and, therefore, precluded her from receiving the full four-minute opportunity that the test affords a test taker to give an adequate sample; and (3) despite indicating to Officer Hagen that she was not refusing and asking Officer Hagen to give her a blood or urine test after he terminated the Intoxilyzer test, he refused to do so.

"It is a crime for any person to refuse to submit to a chemical test of the person's blood, breath, or urine under section 169A.51 (chemical tests for intoxication), or 169A.52 (test refusal or failure; revocation of license)." Minn.Stat. § 169A.20, subd. 2. This statutory provision serves Minnesota's compelling interest in protecting its residents from the "severe threat" that impaired drivers pose to public health and safety. *State v. Wiltgen*, 737 N.W.2d 561, 570 (Minn.2007); *Mellett*, 642 N.W.2d at 784. Although an officer cannot force a DWI arrestee to submit to chemical testing, Minn.Stat. § 169A.52, subd. 1, the legislature has provided drivers with incentives to cooperate by attaching stringent negative consequences to test refusal. *State v. Spilde*, 536 N.W.2d 639, 641 (Minn. App.1995). Under the civil implied-consent statutes, refusing to submit to a prop-

er request for chemical testing automatically revokes driving privileges for a year. Minn.Stat. § 169A.52, subd. 3. And the threat of criminal sanctions provides an even more powerful incentive, penalizing test refusal more severely than driving while impaired. Minn.Stat. §§ 169A.25–169A.27 (making refusal one offense degree higher than impaired driving for same number of aggravating factors). Thus, section 169A.20, subdivision 2, eliminates any advantage an arrestee might gain from refusing to be tested. *Melde,* 725 N.W.2d at 106 n. 6.

The law governing the crime of test refusal is complex in part because it is defined by reference to provisions of the civil implied-consent statute. *See Spilde,* 536 N.W.2d at 641–42 (noting difficulty of analyzing effects of "complex interrelationship" between criminal refusal and civil implied-consent statutes). Thus, our analysis must apply the constitutional guarantee of due process to the civil implied-consent statutes insofar as they are incorporated into the crime of test refusal. Caselaw interpreting the civil implied-consent statutes offers only limited guidance in this task because due-process guarantees differ in criminal and civil contexts. *See Polsfuss,* 720 N.W.2d at 4 (recognizing different due-process guarantees in each context); *State v. Wagner,* 637 N.W.2d 330, 337 (Minn.App.2001) (noting that proceedings are "related only to the extent that they both generally grow out of the same set of facts" (quotation omitted)).

Fundamental fairness prohibits imposing criminal sanctions on a person who has been deprived of a meaningful opportunity to obey the law. Our legal system is premised on the idea of free will: because every person is presumed capable of conforming his or her conduct to the requirements of the law, "when any person freely chooses to violate the law[,] ... that person may justly be held responsible." *State Farm Fire & Cas. Co. v. Wicka,* 474 N.W.2d 324, 330 (Minn.1991); *see also Calder v. Bull,* 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798) (noting that "[t]his fundamental principle flows from the very nature of our free republican governments"). This deep-rooted concept of fairness manifests itself throughout the criminal-justice system. *See, e.g., State v. Christensen,* 439 N.W.2d 389, 391 (Minn.App.1989) (explaining that due process requires statutes to provide people with "a reasonable opportunity to know what is prohibited, so that [they] may act accordingly" quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)), *review denied* (Minn. June 6, 1989); *Calder,* 3 U.S. (3 Dall.) at 388 (explaining Ex Post Facto Clause as prohibition against punishing person for violating law without first giving that person the opportunity to conform to law). Thus, our analysis of Netland's due-process challenge requires us to determine whether Netland was deprived of a meaningful opportunity to conform her conduct to the requirements of section 169A.20, subdivision 2.

The undisputed evidence demonstrates that Netland never told Officer Hagen that she was unwilling to submit to a chemical test. Each of the numerous tones throughout the audio recording of the breath test conclusively establishes that Netland blew hard enough for the Intoxilyzer to detect her breath, even though the Intoxilyzer ultimately found these samples to be deficient. After Officer Hagen informed Netland that he deemed her failure to provide an adequate breath sample to be a refusal, Netland told him that she was not refusing and "wanted to keep trying." Officer Hagen initially permitted her to continue. But he terminated the test after several more unsuccessful attempts because he "felt [Netland] wasn't trying to

give a[n] appropriate sample." Officer Hagen acknowledged that Netland told him that she would be willing to submit to a blood or urine test. But he "felt she wasn't trying ... [to] giv[e] a valid, long breath" and declined to offer an alternative blood or urine test because "it would lead to ... charging her with a test refusal." Netland, however, on her own initiative secured a private company to come to the jail and test her urine.

▪ The state argues that Officer Hagen provided Netland with a meaningful opportunity to provide a breath sample but that she failed to take advantage of that opportunity by providing an inadequate sample. To decide whether Netland was provided a meaningful opportunity to conform her conduct to the requirements of section 169A.20, subdivision 2, we must first determine what those requirements are. Statutory interpretation presents a question of law, which we review de novo. *Munger v. State*, 737 N.W.2d 604, 609 (Minn.App.2007). We are required to interpret section 169A.20, subdivision 2, in a way that "ascertain[s] and effectuate[s]" the legislature's intent. Minn.Stat. § 645.16 (2004). To do this, we first examine its "specific statutory language and [are] guided by its natural and most obvious meaning." *State v. Edwards*, 589 N.W.2d 807, 810 (Minn.App.1999), *review denied* (Minn. May 18, 1999). If we find that this language is clear and unambiguous, we go no further. *Id.*

The state urges us to construe the term "refuse" in section 169A.20, subdivision 2, as incorporating Minn.Stat. § 169A.51, subd. 5 (2004), which is a provision of the civil implied-consent law stating that failure to provide two "adequate" breath samples in a row or providing two "deficient" tests "constitute[s] a refusal." Essentially, the state assumes that if (1) "[i]t is a crime for any person to refuse to submit to a

chemical test of the person's blood, breath, or urine under section 169A.51"; and (2) section 169A.51 states that "failure of a person to provide two separate, adequate breath samples in the proper sequence constitutes a refusal"; then it follows that (3) it is a crime for any person to fail to provide two separate, adequate breath samples in the proper sequence under section 169A.51, subdivision 5. The state's construction offers only superficial appeal; it is inconsistent with the plain language of either statute.

An "adequate" sample is one in which the breath-testing machine "analyzes the sample and does not indicate the sample is deficient." Minn.Stat. § 169A.51, subd. 5(b). For the Intoxilyzer to analyze a breath sample, the test subject must activate the machine's internal sequence by blowing at least 0.175 liters of air into the mouthpiece during the first second. Activation triggers a tone indicating that the Intoxilyzer is analyzing the subject's breath. And for the Intoxilyzer to accept the sample as sufficient, the subject must maintain this tone by continuing to blow, at an uninterrupted flow-rate of at least 0.15 liters per second, until the subject has provided a total volume of at least 1.1 liters of air. Dropping below 0.15 liters per second for even "a fraction of a second" interrupts the tone, indicating a "deficient sample" and requiring the subject to start over. Failure to provide two separate, adequate samples in sequence "constitutes a refusal." *Id.*, subd. 5(c). And even if the subject provides the Intoxilyzer with an otherwise adequate pair of samples, the test is "deficient" if the samples are not "within 0.02 alcohol concentration" of each other; two such deficient breath tests also "constitute a refusal." *Id.*, subd. 5(d), (f).

The state's argument, however, ignores critical qualifying language in paragraphs

(c) and (d) of subdivision 5. Under the plain language of paragraphs (c) and (d) of subdivision 5, failure to provide two adequate breath samples within 0.02 of each other "constitutes a refusal." But the plain language also provides that this "constitutes a refusal" only "[f]or purposes of section 169A.52 (revocation of license for test failure or refusal)." *Id.*, subd. 5(c), (d). In other words, the legislature has explicitly restricted these conditions to a civil implied-consent context.[3]

Further, the state's suggested definition is at odds with the plain meaning of the language defining the crime itself. "Plain meaning embodies ordinary use of the language in the context of the whole-act structure, applying the usual conventions of grammar and syntax." *First Nat'l Bank of the N. v. Auto. Fin. Corp.*, 661 N.W.2d 668, 670 (Minn.App.2003). The word "refuse" is the main verb of section 169A.20, subdivision 2; it is that which "is a crime for any person to" do. The ordinary meaning of "refuse" connotes a distinctly volitional quality—"[t]o indicate unwillingness to do, accept, give, or allow." *The American Heritage Dictionary of the English Language* 1519 (3d ed.1992). This is inconsistent with a construction that finds "refusal" based on a machine's measurements without reference to the test subject's will.

The syntax of section 169A.20, subdivision 2, demonstrates that it does not incorporate implied-consent provisions as a standard for determining whether the defendant refused because the phrase "under [the implied-consent statutes]" modifies "chemical test," not "refuse." As used in this section, "refuse" is a transitive verb. It is not merely "a crime for any person to refuse," but rather it is "a crime for any person to refuse to submit to a chemical test ... under section 169A.51 (chemical tests for intoxication), or 169A.52 (test refusal or failure; revocation of license)." This phrase is used to set the legal standard for "determin[ing] what is a proper test request for which criminal liability may be imposed." *State v. Olmscheid,* 492 N.W.2d 263, 266 (Minn.App.1992).[4] A defendant is guilty of refusal if he is unwilling to allow himself to be subjected to a chemical test of his blood, breath, or urine under conditions when it "may be required" by those statutes. *See* Minn.Stat. § 169A.51, subd. 1.

In sum, to be convicted of test refusal, a defendant must indicate an unwillingness to submit to chemical testing, despite a proper request to do so. Thus, it follows that fundamental fairness prohibits holding a driver criminally liable for test refus-

---

**3.** Indeed, using paragraphs (c) and (d) of section 169A.51, subdivision 5 to define "refuse" would effectively turn section 169A.20, subdivision 2, into a strict-liability crime. For example, a person could provide nothing but individually adequate samples and still have "refused" if no two consecutive samples fall "within 0.02 alcohol concentration" of each other. While the legislature has the authority to create strict-liability crimes, such crimes generally are disfavored; therefore, "legislative intent to impose strict criminal liability must be clear." *In re Welfare of C.R.M.,* 611 N.W.2d 802, 805 (Minn.2000). We cannot conclude that the legislature intended to impose strict criminal liability with a bare reference to section 169A.51 and an affirmative statement to the contrary that limits that definition of refusal to civil implied-consent penalties.

**4.** For example, without probable cause to believe that the defendant had been driving while impaired, an officer has no authority to request a chemical test, and the defendant could not be convicted of refusing to yield to nonexistent authority. *State v. Ouellette,* 740 N.W.2d 355, 360–61 (Minn.App.2007), *pet. for review filed* (Minn. Oct. 31, 2007); *Olmscheid,* 492 N.W.2d at 265 (holding that probable-cause requirement of section 169A.51, subdivision 1(b), is element of crime of refusal).

al unless the driver has been afforded a fair opportunity to submit to chemical testing but has freely indicated an unwillingness to do so.

Here, it is undisputed that Netland repeatedly told Officer Hagen that she was willing to submit to chemical testing. It is also undisputed that Netland blew enough air into the Intoxilyzer to activate and sustain a tone. Other than the fact that Netland did not continuously sustain a tone long enough for any of her samples to be "adequate," there was nothing to indicate that she was unwilling to submit to the breath test. While Officer Hagen "deemed" her to have refused after the Intoxilyzer indicated that her sample was deficient, Officer Hagen acknowledged that Netland told him, "Officer, look, I'll give you a blood test or give me another test." Because the circumstances indicate that Netland was willing to submit to a chemical test—any chemical test—Officer Hagen was obligated to give her an opportunity to do so.

It is true, as the state points out, that the requesting officer has discretion to select which test—breath, blood, or urine—the subject will initially be required to take. Minn.Stat. § 169A.51, subd. 3 (2004); *see also Moe v. Comm'r of Pub. Safety*, 574 N.W.2d 96, 98 (Minn.App.1998) (holding in a civil implied-consent context that "[d]ue process does not require an arresting officer to offer an initial choice among tests"), *review denied* (Minn. Apr. 14, 1998). In the civil implied-consent context, "[i]f a person fails to provide an adequate breath sample, the officer, absent a determination of physical inability, is not required to offer the driver an additional test." *Smith v. Comm'r of Pub. Safety*, 401 N.W.2d 414, 416 (Minn.App.1987), *review denied* (Minn. Apr. 29, 1987). But this is not a civil implied-consent case.

We emphasize that a criminal prosecution for test refusal and a civil implied-consent proceeding "are related only to the extent that they both generally grow out of the same set of facts." *Wagner*, 637 N.W.2d at 337 (quotation omitted). "[T]he criminal defendant and the petitioner in the implied-consent proceeding are the same person but with different interests at stake." *Id.* The minimum level of fairness that our system of law requires to deprive a driver of driving privileges *is not the same as that required to impose a criminal sanction. See In re Winship*, 397 U.S. 358, 372, 90 S.Ct. 1068, 1077, 25 L.Ed.2d 368 (1970) (due process, as "an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation" (footnote omitted)).

Indeed, section 169A.51, subdivision 3, explicitly contemplates several situations in which fairness requires the officer to offer an alternative test. Although the officer initially has the discretion to choose which test to offer, "[a]ction may be taken against a person who refuses to take a blood [or] . . . urine test only if an alternative test was offered." Minn.Stat. § 169A.51, subd. 3. Presumably, because these tests are more invasive than a breath test, a person who is unwilling to submit to one of these types of tests should be not be penalized unless offered an alternative. *Workman v. Comm'r of Pub. Safety*, 477 N.W.2d 539, 540 (Minn.App.1991). If, for example, a driver refuses to take a blood test because of a fear of needles but is willing to submit to another type of test, the state may not proceed against the driver for test refusal—civilly or criminally—unless the driver is offered an alternative test. Moreover, the commissioner of public safety may not deprive a person of driving privileges for refusing a breath test that the driver is physically incapable of taking. *See* Minn. R. 7502.0430 (2005).

Officer Hagen testified that he always offers a breath test unless the subject is not physically capable because it is conveniently located at the jail, gives an immediate result, and "doesn't put a burden on ... medical [or] lab people." But he admitted on cross-examination that a blood test "would take less than 15 minutes" to complete at a nearby hospital and a urine test could be performed at the jail. If properly performed, the evidence derived from a chemical test is equally usable whether it takes the form of "the number of grams of alcohol per 100 milliliters of blood[,] ... per 210 liters of breath[,] or ... per 67 milliliters of urine." *See* Minn. Stat. §§ 169A.03, subd. 2 (defining "alcohol concentration"), 169A.45, subd. 1 ("the court may admit evidence of the presence or amount of alcohol in the person's blood, breath, or urine as shown by an analysis of those items") (2004). Officer Hagen acknowledged that Netland specifically told him that she would be willing to take a blood or urine test, but he declined to offer an alternative test and charged her with test refusal. Netland never said that she refused to take a breath test, however. To the contrary, she asked for another chance with the Intoxilyzer after Officer Hagen deemed her to have refused. After it was apparent that Officer Hagen had grown tired of what he perceived to be her unwillingness to properly blow into the Intoxilyzer, Netland asked for the opportunity to take a blood test—a test in which Officer Hagen's concerns about Netland "playing games" would not be at issue because a nurse would take the sample. Finally, when Officer Hagen declined that, Netland secured and submitted to a urine test at her own expense.

In addition, the record is controverted as to whether Officer Hagen gave Netland the full amount of time allowed by the Intoxilyzer to take the breath test. Both expert testimony and our prior implied-consent decisions acknowledge that the four-minute requirement is programmed into the Intoxilyzer so that the subject will have a sufficient opportunity to provide a reliable sample for analysis. *E.g., Genia v. Comm'r of Pub. Safety,* 382 N.W.2d 284, 286 (Minn.App.1986). According to Netland's expert testimony, although a standard Intoxilyzer test is four minutes, Officer Hagen deemed Netland to have refused after approximately three minutes and 30 seconds. Officer Hagen maintained that he gave Netland four minutes. But he acknowledged on cross-examination that it would be "unfair" to Netland if, in fact, he had not.

A person's conduct can indicate an unwillingness to submit to an alcohol-concentration test as much as the words "I refuse." *Busch v. Comm'r of Pub. Safety,* 614 N.W.2d 256, 259 (Minn.App.2000); *see also State v. Hardimon,* 310 N.W.2d 564, 566 (Minn.1981) (noting that intent generally must be inferred "from [a person's] words (if any) *and actions* in the light of all the surrounding circumstances").[5] The

---

5. In this context, we reject Netland's argument that the unfairness discussed above implies that the evidence was insufficient to find that she had "refused" to submit to the Intoxilyzer test. The legal standard used to review a due-process challenge is distinct from the legal standard used to review a challenge to the sufficiency of the evidence. When reviewing the sufficiency of the evidence, we assume that the jury drew all reasonable inferences in favor of the conviction, believing the evidence supporting the state's theory of the case and rejecting any contrary evidence. *State v. Jackson,* 726 N.W.2d 454, 460 (Minn.2007). While, under the circumstances, it was fundamentally unfair to punish Netland for "refusing" to provide an adequate breath sample, that Netland did not, in fact, provide an adequate breath sample was circumstantial evidence that she was unwilling to submit to the test offered. For purposes of reviewing the sufficiency of the evidence, we must assume

crime of test refusal punishes the decision a defendant makes freely after being warned of its consequences. *See Spilde,* 536 N.W.2d at 641 (describing refusal as a "choice"); Minn.Stat. § 169A.51, subd. 2(2) (requiring person to be informed that refusal is a crime when test is requested). The failure to offer an alternate test under the totality of circumstances present here deprived Netland of the opportunity to make this choice freely, which fundamental fairness requires. The alternate test requested by Netland would have facilitated the purpose of section 169A.20, subdivision 2, namely, to provide the state with scientific evidence of the amount of alcohol in the driver's body. Because Netland was not given a meaningful opportunity to demonstrate her willingness to submit to chemical testing, we hold that Netland's conviction was obtained in violation of due process.

### III.

 Netland also argues that the district court erroneously denied her motion for a mistrial. A district court has the discretion to determine "whether, for compelling reasons, 'the ends of substantial justice cannot be attained without discontinuing the trial.'" *State v. Long,* 562 N.W.2d 292, 296 (Minn.1997) (quoting *Gori v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961)). A mistrial should not granted "unless there is a reasonable probability that the outcome of the trial would be different." *State v. Spann,* 574 N.W.2d 47, 53 (Minn. 1998). The district court is in the best position to evaluate whether this is the case. *State v. Marchbanks,* 632 N.W.2d 725, 729 (Minn.App.2001). We therefore review a district court's denial of a motion

for a mistrial for an abuse of discretion. *State v. Mahkuk,* 736 N.W.2d 675, 689 (Minn.2007).

Netland moved for a mistrial immediately after jury selection. Although the record does not reflect precisely what was said, it is clear that, during voir dire, the district court read the specific offenses with which Netland was charged-third-degree DWI and second-degree DWI (test refusal). Netland, who had already stipulated to her prior DWI conviction, argued that any jurors who were familiar with the distinctions among the degrees of DWI offenses "may be tipped off . . . that [Netland] has a prior DWI." The district court denied the motion, explaining that "[t]hose charges are in the complaint," and there was no mention of a prior DWI conviction. Whether reading the specific degree of DWI charged prejudices a defendant by indirectly informing the jury of a previously stipulated conviction appears to be an issue of first impression.

Evidence of a defendant's prior DWI conviction usually is inadmissible in a prosecution for the same because of its "great potential for being improperly used." *State v. Berkelman,* 355 N.W.2d 394, 397 n. 2 (Minn.1984) (citing Minn. R. Evid. 404(b)). If the jury is aware that the defendant has already been convicted of impaired driving, there is a "considerable" risk that the jury will draw the conclusion that the defendant has simply done it again. *Id.* But the prior conviction also may be an essential element of the crime with which the defendant is charged. *Id.* at 396. By stipulating to the prior conviction, a defendant removes it as an issue, effectively presenting to the jury what appears to be "an ordinary DWI case." *Id.* at 397 n. 2.

---

that the jury reached this conclusion and also believed Officer Hagen's testimony that Netland was attempting to prevent the machine

from accurately measuring the alcohol concentration in her breath.

The definitions of the four degrees of DWI are set forth throughout several sections of chapter 169A. Section 169A.20, subdivision 1, defines the offense of operating a motor vehicle under the influence of alcohol, and subdivision 2 defines the offense of test refusal. Although each subdivision defines a primary genus of a DWI offense, section 169A.20 does not define the degree attached to the offense. Rather, it refers to other sections to define the various degrees of a DWI offense. Minn. Stat. § 169A.20, subd. 3 (2004) (referring to Minn.Stat. §§ 169A.24–169A.27 (2004)). Other than first-degree DWI,[6] the degree of offense is a function of the aggravating factors present in a particular case. Minn. Stat. §§ 169A.27, 169A.26, subd. 1(b) (no aggravating factors: fourth-degree impaired driving, third-degree test refusal), 169A.26, subd. 1(a), 169A.25, subd. 1(b) (one aggravating factor: third-degree impaired driving, second-degree test refusal); 169A.25, subd. 1(a) (two aggravating factors: second-degree impaired driving).

A DWI conviction within the past ten years is an "aggravating factor." Minn. Stat. § 169A.03, subds. 3(1), 22 (2004). But there also are two other aggravating factors: (1) "having an alcohol concentration of 0.20 or more as measured at the time, or within two hours of the time, of the offense," and (2) "having a child under the age of 16 in the motor vehicle at the time of the offense if the child is more than 36 months younger than the offender." Minn.Stat. § 169A.03, subd. 3(2), (3). Thus, even if a juror is familiar with the distinctions among the various degrees of DWI, the degree alone conveys no information about which aggravating factor applies to the defendant.

The district court did not inform the jury that Netland's prior DWI conviction was the particular aggravating factor underlying the specific degrees of DWI charged. The district court did not instruct the jury that the state was required to prove an aggravating factor as an element of either offense. Indeed, there was no mention of Netland's prior DWI conviction, and the jury ultimately acquitted Netland of the third-degree DWI charge. The district court was in the best position to determine that there was not a compelling reason to believe that the ends of justice required discontinuing the trial after the specific offenses for which Netland was on trial were read. The district court's decision to deny Netland's motion for a mistrial was a sound exercise of the district court's discretion.

**IV.**

Netland also argues that the district court improperly admitted the results of the incomplete Intoxilyzer test because the state failed to lay an adequate foundation. Evidentiary rulings rest within the district court's sound discretion. *State v. Plantin*, 682 N.W.2d 653, 658 (Minn.App.2004), *review denied* (Minn. Sept. 29, 2994). We will not reverse unless the district court has clearly abused that discretion. *Id.* The appellant has the burden of establishing both an abuse of discretion and prejudice resulting from it. *Id.*

A partial Intoxilyzer test may be "competent evidence bearing upon the question of whether the person violated section 169A.20." Minn.Stat. § 169A.45, subd. 4 (2006). The district court has the discretion to determine whether partial-test evidence is competent. *State v. Kieley*, 413 N.W.2d 886, 888 (Minn.App.1987) (citing *State ex rel. Dugal v. Tahash*, 278 Minn.

---

**6.** First-degree DWI specifically requires either: (1) three or more qualified prior DWI incidents, or (2) a prior felony conviction for first-degree DWI. Minn.Stat. § 169A.24.

175, 177, 153 N.W.2d 232, 234 (1967)). A district court may conclude that evidence is competent if it appears capable of correctly establishing the facts to which it is relevant. *See Dugal,* 278 Minn. at 177–78, 153 N.W.2d at 234 (discussing test to determine competency of witness).

Netland cites *Kieley* for the proposition that partial-test evidence is competent only if the state established a sufficient foundation to prove that her alcohol concentration was at least as high as the test results. Her reliance on *Kieley* is misplaced because the partial test result in *Kieley* was used to prove that the defendant was actually intoxicated when she was driving—the offense of which Netland was acquitted. 413 N.W.2d at 887–88. With respect to test refusal, however, that the Intoxilyzer test was incomplete was competent circumstantial evidence that Netland was unwilling to provide a reliable sample of her breath; whether she was actually impaired by alcohol is irrelevant. Thus, the district court did not abuse its discretion by admitting the partial test result.

## DECISION

Because neither the criminal test-refusal statute nor the civil implied-consent law conditions the driving privilege on surrendering the Fourth Amendment right to withhold consent from a warrantless search, Minn.Stat. § 169A.51 (2004) is not unconstitutional. A valid test request under Minn.Stat. § 169A.51 meets the constitutional requirements for a warrantless search based on exigent circumstances, not a driver's consent. Under the circumstances presented here, when the driver was deemed to refuse to submit to a chemical test based on providing an inadequate breath sample and the driver sought both additional time to provide an adequate sample and an alternate mode of chemical testing, the failure to provide an alternate method of chemical testing renders a conviction for refusal to submit to a chemical test a violation of the fundamental fairness guarantees of due process.

**Reversed.**