STATE of Minnesota, Appellant,

v.

Jakklyn M. NETLAND, Respondent.

No. A06–1511.

Supreme Court of Minnesota.

Feb. 12, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Michael J. Colich, Tania K.M. Lex, Colich & Associates, Minneapolis, MN, for appellant.

Charles A. Ramsay, Daniel J. Koewler, Charles A. Ramsay & Assoc., PLLC, Roseville, MN, for respondent.

## OPINION

GILDEA, Justice.

Respondent Jakklyn Netland challenged her conviction for second-degree criminal

test refusal, arguing that her right to due process was violated by the manner in which the breathalyzer test was administered and that the criminal test-refusal statute violated her right to be free from unreasonable searches and seizures. Netland raised the due process issue to the district court, and that court rejected her argument. On appeal, Netland additionally raised the issue that the criminal test-refusal statute violated her right to be free from unreasonable searches and seizures. The court of appeals held that the criminal test-refusal statute does not violate the constitutional protection against unreasonable searches because the exigency exception to the warrant requirement permits a warrantless search for blood-alcohol content. *State v. Netland*, 742 N.W.2d 207, 214–15 (Minn.App.2007). The court of appeals, however, reversed Netland's conviction, concluding that her right to due process was violated. *Id.* at 221. Because we hold that Netland's right to due process was not violated and that the criminal test-refusal statute did not result in an unconstitutional search, we reverse.

The record reveals that a police officer stopped Netland's car at approximately 1:45 a.m. on January 7, 2006, because he observed her driving erratically. Based on his observations, the officer thought Netland was under the influence of alcohol. After smelling alcohol on Netland's breath, observing her bloodshot eyes, and hearing her slurred speech, the officer asked Netland to step out of the car. Netland steadied herself on the vehicle as she left the vehicle. The officer administered, and Netland failed, three field sobriety tests.

The officer also offered a preliminary breath test that Netland declined.

The officer arrested Netland and took her to the nearby stationhouse, where he read her the implied-consent advisory required by Minn.Stat. § 169A.51, subd. 2 (2008).[1] Netland agreed that she understood all provisions of the advisory. After consulting with counsel, Netland told the officer that she would take a test because the attorney informed her that the consequences of refusal would be worse than the consequences of finding alcohol in her blood. Netland requested a blood test. The officer, however, informed Netland that he would administer a breath test. The officer testified that he usually requires a breath test for persons he suspects of driving under the influence because the breath test is easy to administer and returns immediate results.

The officer turned on the Intoxilyzer breath-testing machine and explained how the machine worked so Netland could take the test. Within moments of Netland's first attempted breath sample, the officer informed her that the reading on the machine indicated that she was not blowing and that if the machine timed out before she provided adequate breath samples, the result would be considered a refusal to take the test. Netland responded that she was trying to blow into the machine.[2] The Intoxilyzer registered that Netland made 19 attempts to give a sample, but none of those attempts registered as an adequate sample.

After the Intoxilyzer reported a deficient test, Netland asked to take the test again. The officer denied the request be-

---

1. Specifically, the advisory Netland received included that Minnesota law required her to take the chemical test, that refusal to take the test was a crime, and that she had the right to consult with counsel prior to submitting to the test. Minn.Stat. § 169A.51, subd. 2.

2. The record established that the machine was programmed to run for four minutes and that at the end of the four-minute period, the machine would "time out" if a sample adequate to test was not provided.

cause he observed Netland "starting and stopping" while she made her attempts during the first test. Netland then asked to take an independent chemical test. The officer complied with this request and the record shows that Netland utilized a private agency to conduct a urine test. Lab analysis from the independent test indicated that Netland had a blood-alcohol concentration of 0.036 at the time that test was taken.

The State subsequently charged Netland with one count of second-degree test refusal, a gross misdemeanor, in violation of Minn.Stat. § 169A.20, subd. 2 (2008), which makes it "a crime for any person to refuse to submit to a chemical test." The State also charged Netland with one count of third-degree driving while impaired, a gross misdemeanor, in violation of Minn. Stat. 169A.20, subd. 1(1) (2008), which makes it "a crime for any person to drive . . . when the person is under the influence of alcohol." [3] A jury found Netland guilty of second-degree criminal test refusal, but not guilty of driving while impaired. Netland made a motion for a new trial, arguing that her right to due process was

violated. The district court denied this motion.

On appeal, the court of appeals held that the test-refusal statute, Minn.Stat. § 169A.20, subd. 2, did not violate the constitutional protection against unreasonable searches. *Netland,* 742 N.W.2d at 215. But the court determined that Netland was willing to submit to a chemical test for the presence of alcohol and that the officer had therefore denied Netland a "meaningful opportunity to obey the law," in violation of her due process rights. *Netland,* 742 N.W.2d at 216, 221. We granted the State's petition for review on the due process issue. In its petition for review, the State framed the issue as follows: "Are a defendant's due process rights violated when the officer administering the test deems the defendant to have refused the test after the defendant fails to provide an adequate breath sample and when the officer thereafter does not offer an alternative test to the defendant?" [4] We also granted Netland's cross-petition to review the constitutionality of the test-refusal statute under the Fourth Amendment of the United

**3.** Netland's driving while impaired charge was a gross misdemeanor because she had a previous driving while impaired conviction from 2001, which operated as an aggravating factor. Minn.Stat. § 169A.26, subd. 1(a) (2008) ("A person who violates section 169A.20, subdivision 1 (driving while impaired crime), is guilty of third-degree driving while impaired if one aggravating factor was present when the violation was committed."); *see also* Minn.Stat. § 169A.03, subd. 3(1) (2008).

**4.** Because the court of appeals determined that due process is violated when a defendant is not given a meaningful opportunity to conform with the law, the court turned to a statutory analysis to determine what the law required from Netland. *Netland,* 742 N.W.2d at 217 ("To decide whether Netland was provided a meaningful opportunity to conform her conduct to the requirements of section 169A.20, subdivision 2, we must first deter-

mine what those requirements are."). As set forth below, we do not adopt the "meaningful opportunity to conform" standard the court of appeals utilized, and therefore it is not necessary for us to address the statutory interpretation question the court of appeals addressed. Moreover, Netland's motion for a new trial challenged the circumstances of the refusal on due process grounds. Netland did not argue to the district court or to the court of appeals that her conviction was inconsistent with the terms of the criminal test-refusal statute. The dissent argues that the statutory interpretation question it addresses should be resolved before the constitutional issue we address. But because Netland did not argue that her conviction conflicts with the statute, we conclude that the statutory interpretation question is better left for another case when the record on this question is developed at the district court.

States Constitution and article I, section 10 of the Minnesota Constitution.

## I.

■ We turn first to the question of whether Netland's right to due process was violated. Both the United States and Minnesota Constitutions afford criminal defendants due process of law. U.S. Const., Amend. XIV; Minn. Const. art. I, § 7. We review the constitutional issue of whether a defendant's right to due process was violated de novo. *State v. Dorsey,* 701 N.W.2d 238, 249 (Minn.2005).

■ Netland argues, and the court of appeals agreed, that her right to due process was violated in this case because she was not given a meaningful opportunity to obey the law. The court of appeals held that "[f]undamental fairness prohibits imposing criminal sanctions on a person who has been deprived of a meaningful opportunity to obey the law." *Netland,* 742 N.W.2d at 216.[5] But in adopting this stan-

dard, the court of appeals relied on cases that address the concept of due process within the context of a challenge that a criminal statute violates due process because the statute is unconstitutionally vague. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (noting that "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"), *State v. Christensen,* 439 N.W.2d 389, 390 (Minn. App.1989) (addressing whether "Minn.Stat. §§ 152.093 and 152.01, subd. 18 [were] unconstitutionally vague on their face and as applied"). Netland makes no argument that the test-refusal statute is unconstitutionally vague, and as a result, the standard that the court of appeals created based on these cases is inapplicable here. Netland has not cited any case from any court that recognizes a "meaningful opportunity to obey the law" as a due process standard. We decline to recognize such a standard in this case.[6]

**5.** From this standard, the court of appeals turned to construe the law to which Netland must conform. *Netland,* 742 N.W.2d at 217. The dissent embarks on a similar journey. As noted above, we are not using this case as a vehicle to resolve the statutory interpretation question. But we do note at least one problem with the interpretation the dissent offers. After finding the statute ambiguous, the dissent would apply the rule of lenity and hold that a person to whom a breath test is administered cannot be prosecuted for test refusal unless that person is first offered an alternative type of test. The legislature has, however, already provided for those circumstances when an alternative test must be offered prior to action being taken against a driver. In Minn.Stat. § 169A.51, subdivision 3 (2008), the legislature gave the officer the authority to direct the type of chemical test to be administered and provided that "[a]ction may be taken against a person who refuses to take a blood test only if an alternative test was offered and action may be taken against a person who refuses to take a urine test only if an alternative test was offered." Thus, under

this provision, no alternative test need be offered to a driver who, like Netland, was administered a breath test. The dissent seemingly acknowledges that subdivision 3 applies to the criminal test-refusal statute. See *infra* at D–4 ("In section 169A.51, for example, the requirements for an implied-consent advisory, for *determining the type of test,* and for conducting a blood test could also be required under the criminal test refusal statute." (emphasis added)). Yet, the dissent then reads this provision out of the statute when it "narrowly read[s] [the criminal refusal statute] to require the availability of an alternative testing method if an inadequate breath test sample or deficient breath test are the only evidence of refusal." At least in this regard, the interpretation the dissent offers is internally contradictory and inconsistent with the principle of statutory construction that every provision in state law must be given effect. Minn.Stat. § 645.16 (2008).

**6.** The court also cited *State Farm Fire & Cas. Co. v. Wicka,* 474 N.W.2d 324, 330 (Minn. 1991), but that case was not about due pro-

Netland argues, however, that her right to due process was violated because the circumstances of her breath test were unfair. Our precedent recognizes that the constitutional guarantees of due process in the United States and Minnesota Constitutions include substantive components prohibiting " 'certain arbitrary, wrongful government actions, "regardless of the fairness of the procedures used to implement them." ' " *In re Linehan,* 594 N.W.2d 867, 872 (Minn.1999) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)). These components include the right of "every criminal defendant . . . to be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.' " *State v. Quick,* 659 N.W.2d 701, 712 (Minn.2003) (quoting *State v. Richards,* 495 N.W.2d 187, 191 (Minn.1992)). But, as the Supreme Court has noted, courts are "reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *see also Dowling v. United States,* 493 U.S. 342, 352–53, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (noting that "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation" and that the "category of infractions that violate 'fundamental fairness' [has been defined] very narrowly" to include only those that violate "the community's sense of fair play and decency"); *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) ("Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' ").

As these cases recognize, the initial inquiry in any due process challenge is to identify the precise nature of the constitutional right asserted by the aggrieved party and the government conduct allegedly depriving the party of that right. *See Frank v. Maryland,* 359 U.S. 360, 363, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) ("Application of the broad restraints of due process compels inquiry into the nature of the demand being made upon individual freedom in a particular context and the justification of social need on which the demand rests."), *overruled in part on other grounds by Camara v. Mun. Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Netland contends that her encounter with the officer administering the breath test at the law-enforcement stationhouse violated her right to due process. Specifically, in her motion for a new trial, Netland argued that her right to due process was violated because "she was not given four minutes to supply an adequate [breath] sample." Netland expanded the grounds for her argument in her brief to the court of appeals, arguing that she "insisted she was not refusing to take the test and that [she] pleaded with [the officer] to let her take an alternative test."

cess. The case "involv[ed] whether an intentional act exclusion of a homeowner's liability policy applies to the conduct of an insured who, because of mental illness, may lack the capacity to form the intent to injure." *Id.* at 325. Finally, the court cited *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798). In *Calder,* the court addressed "the prohibition against [the] making [of] any ex post facto laws." 3 U.S. (3 Dall.) at 389. Netland does not claim that the test-refusal statute is an ex post facto law. *See id.* at 390 (noting that a law "that makes an action done before the passing of the law, and which was innocent when done, criminal" is an ex post facto law).

Netland seems to advance two theories on which the conditions of her chemical test might be said to have violated her right to due process. She argues that the officer acted in bad faith by denying her access to the breath-testing machine before the machine completed its programmed four-minute cycle and by denying her a second test. Netland also argues that these same aspects of the police officer's behavior shock the conscience so as to make her conviction for test refusal unconstitutional. We examine each theory in turn.

■ We turn first to consideration of whether the officer acted in bad faith and thereby violated Netland's right to due process. We have recognized that a due process claim can be based on a government agent's bad faith, which can include an improper purpose motivating the government action. *See Kohn v. State ex. rel. Humphrey*, 336 N.W.2d 292, 297 (Minn. 1983) (stating that "an investigation ... undertaken for an improper purpose, such as harassment, would violate due process"). In *State v. Larivee*, we considered whether an officer's denial of a defendant's request to obtain an independent blood-alcohol-concentration test after the defendant refused the state-offered test denied the defendant due process of law. 656 N.W.2d 226, 230 (Minn.2003). We rejected the defendant's due process challenge for denial of access to an independent test because "the denial of access [to an independent test], although deliberate, was made without animus and in accord with what the booking officer believed was the appropriate procedure." *Id.* at 231. The evidence in *Larivee* negating bad faith included the fact that the officer denied the defendant's request "during the routine booking process." *Id.* The officer in *Larivee* also correctly believed that only persons who had not refused the state-offered test were entitled to independent tests. *Id.*

The record in this case similarly reveals a lack of animus or bad faith. The officer testified that he denied Netland's request for an additional test because he had observed Netland "starting and stopping" during the first test, rather than providing a consistent breath necessary to yield a valid sample. The court of appeals stated that the record reflects that the officer terminated the test because he "felt she wasn't trying" and declined to grant her request for an alternative test because "it would lead to ... charging her with a test refusal." *Netland*, 742 N.W.2d at 217. But the court of appeals' conclusion reads the officer's testimony out of context. The officer's testimony indicates that the officer believed Netland attempted to manipulate the results of the first test and that, if he allowed another test, she would continue to do so. Netland was on notice, moreover, that failure to provide an adequate sample would lead to a test refusal charge because the officer explained at the beginning of the test that the machine's report of a deficient test constitutes a refusal. And at no point during the encounter at the stationhouse, which was recorded and played for the jury, did Netland tell the officer she was having difficulty breathing or suffering from a medical condition that would hinder her ability to take the breath test. Here, as in *Larivee*, although the officer's denial of a second breath test was deliberate, the record does not reveal evidence of bad faith sufficient to support a due process violation.

■■ We turn next to Netland's alternative argument—that the officer violated her right to due process because his behavior shocks the conscience. A defendant's right to due process has been held to be violated where the action of the government agent is such that it "shocks

the conscience." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . ." (citations omitted)). A cognizable claim under this standard must describe "egregious" governmental conduct, and we have said that "[o]nly the most extreme instances of governmental misconduct satisfy this exacting standard." *Mumm v. Mornson,* 708 N.W.2d 475, 487, 490 (Minn.2006) (holding that an officer's use of deadly force to stop a dangerous car chase did not shock the conscience because "[a]n officer's poor judgment in using unreasonable force does not automatically convert the officer's acts into conscience-shocking conduct"). Such behavior has generally included acts with an intent to injure or cause harm. *Id.* at 487–88; *see also Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (concluding that police conduct shocked the conscience when officials entered a defendant's home unlawfully, used physical force against the defendant to pry pills from his mouth and, when unsuccessful, had the defendant's stomach pumped).

■ In this case, Netland contends, in essence, that the officer's decision not to offer an alternative test when she requested to take one shocks the conscience. We cannot agree that such behavior rises to the level of a constitutional violation. The officer did not use force or injure Netland when he did not administer another test. The implied-consent statute, moreover, allows an officer to choose which test to administer and does not require an alternative test when a breath test is refused. Minn.Stat. § 169A.51, subd. 3 (2008); *see also Larivee,* 656 N.W.2d at 232 (holding that denial of an independent chemical test after defendant refused to submit to a

police-administered test did not violate due process). Finally, after the officer refused to administer another breath test to Netland, she was able to secure an independent test of her blood-alcohol content. Under these circumstances, the officer's denial of an additional breath test does not shock the conscience.

We have carefully reviewed the record in this case. The record shows that Netland was advised of her rights through the implied-consent advisory, and she admitted that she understood her rights. Netland was not prevented from offering a complete defense to the refusal charge; she testified at length as to her version of the facts and her claimed willingness to take another test. Netland also provided evidence during trial of the independent test she secured. To be sure, Netland argues that she did not refuse to take the test and that she wanted to continue trying to provide an adequate breath sample. This theory (and the evidence Netland offered to support it) presented a question of fact for the jury to decide, but it does not establish a violation of due process. Based on our careful review of the record, we conclude that Netland's conviction for criminal test refusal is not fundamentally unfair, as our cases have addressed that concept, nor does it offend our "sense of fair play and decency." *Dowling,* 493 U.S. at 352–53, 110 S.Ct. 668. We hold that the circumstances of Netland's chemical test do not rise to the level of a violation of her right to due process.

## II.

■ We turn next to the issue raised in Netland's petition for cross-review. Netland argues that the test-refusal statute violates her right to be free from unreasonable searches and seizures.[7] The

7. U.S. Const. amend. IV; Minn. Const. art. I, § 10.

constitutionality of a statute is a question of law that we review de novo. *Hamilton v. Comm'r of Pub. Safety*, 600 N.W.2d 720, 722 (Minn.1999). We presume that "Minnesota statutes are constitutional," and have said "that our power to declare a statute unconstitutional should be exercised with extreme caution." *Associated Builders & Contractors v. Ventura*, 610 N.W.2d 293, 299 (Minn.2000). The challenging party "bears the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional." *State v. Merrill*, 450 N.W.2d 318, 321 (Minn.1990).

■ Netland first argues that the breath test constitutes an unconstitutional search because the State impermissibly conditions her driving privileges on an unconstitutional, warrantless search for blood-alcohol content. The unconstitutional conditions doctrine originated in *Frost v. R.R. Comm'n of Cal.*, when the Supreme Court discussed the rights of foreign corporations to conduct business across state lines without heavy regulatory burdens that would effectively preclude commerce. 271 U.S. 583, 592, 46 S.Ct. 605, 70 L.Ed. 1101 (1926). In *Frost*, the Supreme Court broadly stated that government may not grant a privilege on condition that the recipient forfeits a constitutional right:

> [A]s a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited, and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Consti-

tution of the United States may thus be manipulated out of existence. *Id.* at 593–94, 46 S.Ct. 605. The Supreme Court has further applied the doctrine in the context of privileges conditioned on infringement of individual liberty rights, such as First Amendment freedoms of speech, religious expression, and association. *See, e.g., O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 721, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (holding that a condition on becoming an independent contractor for a municipality unconstitutionally coerced relinquishment of an individual's right to political association). The application of this doctrine to other constitutional rights is less clear. *See Dolan v. City of Tigard*, 512 U.S. 374, 407 n. 12, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) ("Although it has a long history, ... the 'unconstitutional conditions' doctrine has for just as long suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question." (citation omitted)).

■ Principally, the unconstitutional conditions doctrine reflects a limit on the state's ability to coerce waiver of a constitutional right where the state may not impose on that right directly. Richard A. Epstein, *Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L.Rev. 4, 6–7 (1988). The doctrine is properly raised only when a party has successfully pleaded the merits of the underlying unconstitutional government infringement. *Council of Indep. Tobacco Mfrs. of Am. v. State*, 713 N.W.2d 300, 306 (Minn.2006) ("[T]o invoke this 'unconstitutional conditions' doctrine, appellants must first show the statute in question in fact denies them a benefit they could otherwise obtain by giving up their First Amendment rights."); *see also Rumsfeld v. Fo-*

*rum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59–60, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006) (concluding that the unconstitutional conditions doctrine does not apply to Congress' condition that law schools receiving federal funds may not deny access to ROTC program recruiters because the condition did not unconstitutionally infringe on the freedom of speech); *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 286, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (declining to apply unconstitutional conditions doctrine to incarcerated individual's claim that a voluntary inmate interview coerced forfeiture of the right to remain silent because the interview did not violate the Fifth Amendment). Therefore, in order to proceed with her claim, Netland must establish that the criminal test-refusal statute authorizes an unconstitutional search. Because, as set forth below, we conclude that Netland has not shown that a warrantless search for her blood-alcohol content would have been unconstitutional, we need not determine whether the unconstitutional conditions doctrine applies to Fourth Amendment rights or whether it should be applied to violations of the Minnesota Constitution.

 The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated. . . ." The Minnesota Constitution contains a parallel provision. Minn. Const. art. I, § 10. Taking a sample of an individual's breath con-

stitutes a search for purposes of the Fourth Amendment. *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616–17, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (concluding that taking a blood, breath, or urine sample implicates the Fourth Amendment). But the Supreme Court has held that a warrantless search to determine whether a person was driving under the influence does not necessarily violate the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). We have recognized that warrantless searches are generally unreasonable. *State v. Shriner*, 751 N.W.2d 538, 541 (Minn.2008). Certain exceptions apply to the warrant requirement, however, and the " 'ultimate touchstone of the Fourth Amendment is "reasonableness." ' " *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). Exigent circumstances provide one exception.[8] *Id.* at 541.

In *Shriner*, we held that the "rapid, natural dissipation of alcohol in the blood creates single-factor exigent circumstances that will justify the police taking a warrantless, nonconsensual blood draw from a defendant, provided that the police have probable cause to believe the defendant committed criminal vehicular homicide or operation." *Shriner*, 751 N.W.2d at 549–50. This conclusion rested squarely on our prior jurisprudence upholding warrantless searches if evidence would be destroyed during the time required to obtain a warrant. *Id.* at 548. We further recognized that in the case of dissipating alcohol, even

---

**8.** Consent provides another exception to the warrant requirement. *State v. Hanley*, 363 N.W.2d 735, 738 (Minn.1985). Netland raises *State v. George*, 557 N.W.2d 575, 580 (Minn.1997), for the proposition that consent must be freely and voluntarily given in order to abrogate the warrant requirement. Netland argues that the criminal sanctions im-

posed by the test-refusal statute nullify the voluntariness of submission to a chemical test. Because we are upholding the constitutionality of the search on other grounds, we do not address whether requiring a driver suspected of driving while impaired to submit to a chemical test necessarily coerces consent.

the delay required to obtain a telephonic warrant creates an unreasonable burden for law enforcement to evaluate how much time must pass before the evidence disappears. *Id.* at 549.

 Netland argues that *Shriner* does not compel a result in this case because the police in Shriner had probable cause to believe that Shriner committed criminal vehicular operation. *Id.* at 546, 548. The officer in this case did not have probable cause to believe that Netland had committed a felony when he invoked the implied-consent statute.[9] But exigency does not depend on the underlying crime; rather, the evanescent nature of the evidence creates the conditions that justify a warrantless search. It is the chemical reaction of alcohol in the person's body that drives the conclusion on exigency, regardless of the criminal statute under which the person may be prosecuted.[10]

We reached a similar conclusion in *State v. Paul*, 548 N.W.2d 260 (Minn.1996). There, we concluded that vanishing evidence of blood-alcohol content justified a warrantless entry into the defendant's home because the officer pursued the defendant on probable cause of driving under the influence, a misdemeanor offense.[11] *Id.* at 267. Paul challenged the officer's entry into his home on grounds that the exigency exception would not apply for "an offense of lesser magnitude than a felony." *Id.* at 265. We declined to overturn precedent and to adopt a bright-line rule prohibiting warrantless entry of the home for such lesser offenses. *Id.* at 267. We then discussed the exigent circumstances raised by "the need to preserve evidence of Paul's blood alcohol level," and we compared the need to avoid destruction of blood-alcohol evidence in *Paul* to the need presented by a defendant suspected of committing several felonies. *Id.* at 266–67. We concluded that both cases "present[ed] similar compelling exigent circumstances," regardless of the underlying crimes. *Id.* at 267. We reach the same conclusion in this case. Whether the degree of the underlying offense constitutes a felony or a lesser crime is immaterial to the circumstances created by the dissipating blood-alcohol evidence.

9. In Minnesota, a charge of criminal test refusal follows only after the officer has complied with the procedural protections set out in the implied-consent law. Under the implied-consent statute, all drivers consent to a blood, breath, or urine test to determine the presence of alcohol. Minn.Stat. § 169A.51, subd. 1(a) (2008). A peace officer may require a chemical test if the officer has probable cause to believe a person violates Minnesota's driving while impaired law and one of the following conditions is present: that person is arrested, is involved in a motor vehicle accident, refused a preliminary screening test, or provided a screening test sample with an alcohol concentration of 0.08 or more. Minn.Stat. § 169A.51, subd. 1(b). Upon requesting the test, the officer must present the person with the implied-consent advisory. *Id.*, subd. 2. The advisory explains, among other things, that the test is required, that refusal is a crime, and that the person has the right to consult an attorney. *Id.*, subd. 2(1)-(2) & (4).

10. Netland argues that the possibility of extrapolated evidence taken from a later chemical test nullifies the concern of disappearing evidence during the time required to obtain a warrant. In *Shriner*, we declined to address this issue because the record did not adequately develop the possibility of presenting extrapolation evidence. *Shriner*, 751 N.W.2d at 549. Likewise, the record in this case does not develop the practicability or reliability of presenting evidence extrapolated from blood tests, nor the amount of time necessary to obtain such evidence. As such, we decline to comment on the relevance of extrapolated readings of blood-alcohol content to exigency created by dissipating blood-alcohol evidence.

11. The State prosecuted Paul for driving under the influence pursuant to Minn.Stat. § 169.121 (1998), *Paul*, 548 N.W.2d at 267, the predecessor to the 2008 statute for driving while impaired, section 169A.20, subdivision 1.

■ Netland also argues that exigent circumstances do not justify the search in this case because the State did not show that concern for evanescent evidence motivated the officer to obtain Netland's blood-alcohol content without a warrant. But the constitutionality of a warrantless search is determined based on the objective facts of the case, and not the subjective motivation of the police officer involved. *Brigham City v. Stuart*, 547 U.S. 398, 404–05, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006); *State v. Olson*, 482 N.W.2d 212, 214 (Minn.1992); *see also Shriner*, 751 N.W.2d at 540, 548 ("[R]apid dissipation of alcohol in the blood creates a single-factor exigent circumstance," notwithstanding the fact that the officer "admitted that he was not worried that [the defendant] was 'about to slip under the legal limit.'"). Thus, the officer's concern does not negate the relevant objective facts, namely the rapidly dissipating blood-alcohol evidence that creates the exigent circumstance.

■ We hold that the criminal test-refusal statute does not violate the prohibition against unreasonable searches and seizures found in the federal and state constitutions because under the exigency exception, no warrant is necessary to secure a blood-alcohol test where there is probable cause to suspect a crime in which chemical impairment is an element of the offense.[12]

Affirmed in part and reversed in part.

PAGE, Justice (dissenting).

DISSENT

I join in the dissent of Justice Meyer. I write separately to note that it is not clear to me how a person can violate the criminal test-refusal statute when they agree to take a test but have their request for a blood test denied.

ANDERSON, PAUL H., Justice (dissenting).

DISSENT

I join in the dissent of Justice Meyer. I write separately to express my concern about another facet of the majority opinion.

In *State v. Shriner*, 751 N.W.2d 538, 549 (Minn.2008), we held that the rapid, natural dissipation of alcohol in the blood creates a single-factor exigent circumstance that allows law enforcement to force the drawing of blood from a defendant when probable cause exists that the defendant has committed criminal vehicular homicide or operation under Minn.Stat. § 609.21 (2006). I joined Justice Meyer's dissent in *Shriner* because I agreed that the majority had created a new rule of law that eroded the rights of Minnesota citizens to be secure from unreasonable searches and seizures under the United States and Minnesota Constitutions. *See Shriner*, 751 N.W.2d at 550 (Meyer, J., dissenting).

Today I again dissent because I conclude that the majority has further eroded these rights by extending the single-factor exigency rule beyond criminal vehicular homicide and applying it to driving while intoxicated offenses. *State v. Netland*, 762 N.W.2d at 212–14. For the same reasons set forth in the *Shriner* dissent, 751 N.W.2d at 550–57, I believe it is unwise to say that law enforcement is per se justified in taking blood-evidence evidence without a warrant in DWI cases. Rather, we should maintain our jurisprudence that requires the State, under a totality-of-the-

12. Netland filed a motion in this court to supplement the record. We deferred Netland's motion until consideration of the appeal on its merits. Having considered the merits, we deny Netland's motion.

circumstances analysis, to explain why law enforcement could have reasonably believed the blood-alcohol evidence would disappear before a warrant could be obtained.

MEYER, Justice (dissenting).

## DISSENT

I respectfully dissent. I would affirm the court of appeals, but on different grounds.

The majority opinion focuses on the issue as it was framed by the court of appeals: Were Netland's due process rights violated because she was not given a meaningful opportunity to obey the law? The majority should not decide a constitutional question when a ruling under the interpretation of a statute will answer the question of whether Netland refused to submit to a chemical test. *See State v. Bourke*, 718 N.W.2d 922, 926 (Minn.2006); *In re Senty–Haugen*, 583 N.W.2d 266, 269 n. 3 (Minn.1998) ("It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise."). I would rely on the statutory framework in our driving while impaired and implied consent laws to conclude that Netland did not criminally refuse to submit to a chemical test and, therefore, her conviction must be reversed.

Netland's conviction rests on whether her actions constitute a criminal test "refusal" under Minn.Stat. § 169A.20, subd. 2 (2008). Statutory interpretation is an issue of law that is reviewed de novo. *State v. Mauer*, 741 N.W.2d 107, 111 (Minn. 2007). When interpreting a statute, the goal is "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2008). The best method of divining the legislature's intention is to rely on the plain language of the statute. *State v. Iverson*, 664 N.W.2d 346, 350–51 (Minn.

2003). When the language is clear, we are bound to give effect to that language. *Id.* at 351 (citing *State v. Loge*, 608 N.W.2d 152, 156–57 (Minn.2000)). If a criminal law is ambiguous, the rule of lenity requires us to construe the law narrowly. *State v. Maurstad*, 733 N.W.2d 141, 148 (Minn.2007) (citing *State v. Zeimet*, 696 N.W.2d 791, 794 (Minn.2005)).

Our legislature has set out that any person who drives a motor vehicle within this state consents to a blood, breath, or urine chemical test to determine the presence of alcohol, if probable cause for driving while impaired exists. Minn.Stat. § 169A.51, subd. 1 (2008). Two distinct sanctions for refusing to submit to a chemical test have been set out by statute: a penalty for civil test refusal, and a penalty for criminal test refusal. The consequence for civil test refusal is the revocation of a person's license to drive. *Id.* § 169A.52, subd. 3 (2008). The penalties provided for a criminal test refusal are the same as those for impaired driving in the first, second, or third degree—imprisonment, fines, and license revocation. *Id.* § 169A.20; *see id.* §§ 169A.24–.276, 169A.54. A review of Netland's conviction triggers one question: what constitutes a criminal test refusal?

The criminal driving while impaired statute states:

It is a crime for any person to refuse to submit to a chemical test of the person's blood, breath, or urine under section 169A.51 (chemical tests for intoxication), or 169A.52 (test refusal or failure; revocation of license).

Minn.Stat. § 169A.20, subd. 2. The statute does not define the word "refuse." The statute does, however, reference sections 169A.51, the chemical tests for intoxication statute, and 169A.52, the civil penalty for chemical test refusal. I therefore look to those statutes to see how they

inform the definition of "refusal" under the criminal test refusal statute.

Chemical tests for intoxication under both refusal statutes are governed by Minn.Stat. § 169A.51. This section states that any person who drives a motor vehicle in this state consents "to a chemical test of that person's blood, breath, or urine for the purpose of determining the presence of alcohol." *Id.*, subd. 1. The statute requires officers who request an individual to submit to a chemical test to give an implied consent advisory, *id.*, subd. 2, and lists several other conditions of the chemical test, such as who is qualified to administer a blood test, *see id.*, subd. 7.

The statute also sets out the administrative procedures of the chemical test. Section 169A.51, subd. 3, states that the officer "may direct whether the test is of blood, breath, or urine." The subdivision says that action may be taken against a person who refuses to take a blood test only if an alternative test was offered, and action may be taken against a person who refuses to take a urine test only if an alternative test was offered. *Id.* Similarly, a blood test or a urine test may be required after a breath test if there is probable cause to believe that the individual has used a controlled substance, but action can again be taken after a blood or urine test refusal only if the other type of test was offered. *Id.*, subd. 4.

These administrative procedures delineate what qualifies as an adequate breath test sample using a breath test instrument. *Id.*, subd. 5. Subdivision 5 contains several subparts that specify certain circumstances of refusal, stating:

(c) For purposes of section 169A.52 (revocation of license for test failure or refusal) ... failure of a person to provide two separate, adequate breath samples in the proper sequence constitutes a refusal.

(d) For purposes of section 169A.52 (revocation of license for test failure or refusal) ... a breath test consisting of two separate, adequate breath samples within 0.02 alcohol concentration is acceptable. A breath test consisting of two separate, adequate breath samples failing to meet this criterion is deficient.

(e) If the first breath test is deficient, as defined by paragraph (d), a second breath test must be administered.

(f) Two deficient breath tests, as defined by paragraph (d), constitute a refusal.

The criminal test refusal statute also references section 169A.52. That section tells police officers how to report a test refusal or failure and allows officers to obtain a test despite a refusal if there is probable cause to believe criminal vehicular homicide has occurred. *Id.* § 169A.52, subds. 1, 2. Most of the section delineates the procedures and consequences surrounding a civil chemical test refusal or failure. *Id.*, subds. 3–8. License revocation is generally the civil punishment for test refusal or failure. *Id.*

Although section 169A.20, subd. 2, references both sections 169A.51 and 169A.52, it is silent as to what parts of those sections should be incorporated into the criminal test refusal statute. Some components of those sections would not make sense if incorporated into criminal test refusal; the most obvious example is the detailed procedures and consequences for a civil test refusal. *See* Minn.Stat. § 169A.52. Several other components could transfer more easily. In section 169A.51, for example, the requirements for an implied-consent advisory, for determining the type of test, and for conducting a blood test could also be required under the criminal test refusal statute. In section 169A.52, the subdivision that allows an officer to automatically

obtain a test on suspicion of vehicular homicide could also be applied to criminal test refusal.

Only one subdivision of the chemical tests for intoxication statute is expressly excluded from being incorporated into the criminal test refusal statute. Section 169A.51, subd. 5(c) and (d), clearly state that in those provisions, an inadequate or deficient breath sample is a refusal only "for the purposes of 169A.52," the civil test refusal penalty. Under the plain wording of the chemical tests for intoxication statute, the legislature did not extend criminal liability to "refusals" based on inadequate breath samples or deficient breath tests.

Beyond this, the definition for criminal test refusal has not been well articulated by the legislature—the criminal statute is silent regarding whether criminal consequences exist when an individual refuses only to take a breath test. The statute is also silent as to what constitutes a breath test refusal that violates the criminal refusal statute. The clear exclusion of inadequate or deficient breath tests further muddles the definition of criminal refusal: while an inadequate or deficient breath test does not constitute criminal refusal, the statute does not speak to the criminal implications of an individual's inability or unwillingness to submit to a breath test.

Therefore, I would submit that the meaning of refusal under the criminal statute is ambiguous. Ambiguous criminal statutes are interpreted in congruence with the rule of lenity, which posits that " 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity' towards the defendant." *State v. Orsello,* 554 N.W.2d 70, 74 (Minn.1996) (citations omitted), *superseded by statute*

*on other grounds.* In considering both the limiting language of section 169A.51, subd. 5(c) and (d), and the rule of lenity, I conclude that the criminal refusal statute must be narrowly read to require the availability of an alternative testing method if an inadequate breath test sample or deficient breath test is the only evidence of refusal. This is not to say that the officer must offer all three tests to a person in every criminal refusal scenario—the use of the disjunctive word "or" defeats such a reading. *See Munger v. State,* 749 N.W.2d 335, 338 (Minn.2008).

My interpretation of the test refusal statute instead narrows the issue: whether Netland's refusal conviction can be upheld when failure to provide an adequate breath test is not considered criminal refusal.[1] In reviewing whether the evidence is sufficient to uphold a conviction, we are required to "make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Brown,* 732 N.W.2d 625, 628 (Minn.2007). The reviewing court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *Bernhardt v. State,* 684 N.W.2d 465, 476–77 (Minn.2004).

Even when viewed in a light most favorable to the verdict, the evidence does not support a conviction under the narrow interpretation of the criminal refusal statute I have set forth.[2] Officer Hagen ended

1. In her appeal to the court of appeals, Netland argued that the record was insufficient to support her conviction for criminal refusal to submit to a breath test. I reach the statutory interpretation question based on this argument that Netland asserted.

2. In a footnote, the court of appeals concluded that Netland had refused under the crimi-

Netland's chemical test on the basis of Netland's deficient breath test, and his belief that Netland was trying to manipulate the machine. Netland requested an alternative test from Officer Hagen and then hired a private agency to conduct a urine test. Although the events surrounding her breath test could fall under the civil test refusal penalty, the facts in this case do not contain any evidence of refusal other than inadequate breath samples, a deficient breath test, and testimony that Netland was not trying to provide an adequate sample. An inadequate sample or deficient breath test, which constitutes a refusal under the civil test refusal statute, cannot be the sole basis for a factfinder to also find the criminal test refusal statute was violated—to hold differently would go against the plain wording of the chemical tests for intoxication statute.

I would affirm, on different grounds, the court of appeals' decision to reverse the district court's conviction of criminal test refusal.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Meyer.

nal test refusal statute. *Netland,* 742 N.W.2d at 221 n. 5. Reviewing the issue for sufficiency of the evidence, the court concluded that it would have to assume that the jury believed Officer Hagen's testimony that Netland was attempting to prevent the machine from accurately measuring the alcohol concentration in her breath. *Id.* This would constitute criminal test refusal as the court of appeals construed the statute, but I have articulated a narrower standard for criminal test refusal than the court of appeals.