**STATE of Minnesota, Respondent,**

v.

**Christopher Thomas WENTHE, Appellant.**

**No. A12–0263.**

Court of Appeals of Minnesota.

Nov. 26, 2012.

Paul Engh, Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN, John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; HOOTEN, Judge; and CRIPPEN, Judge.

## OPINION

CRIPPEN, Judge.*

Appellant argues that the clergy sexual conduct statute violates the Establishment Clause of the U.S. Constitution on its fact. He further argues his conviction of third-degree criminal sexual conduct rests on production of evidence that was excessively entangled with religion, in violation of the Establishment Clause. We affirm the district court's determination that the statute enunciates secular standards and therefore does not violate the Establishment Clause on its face. But because appellant's conviction was based on evidence that was excessively entangled in matters of religion, the application of the clergy sexual conduct statute violated the Establishment Clause in this case; accordingly, we reverse appellant's conviction and remand for a new trial.

## FACTS

Appellant Christopher Wenthe was a Roman Catholic priest in a St. Paul parish when he first met A.F., a parishioner, in July 2003. In October 2003, appellant heard A.F.'s confession and agreed to serve as her regular confessor. Appellant

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

heard A.F.'s confession anonymously approximately three or four more times.[1]

It is undisputed that a friendship developed between A.F. and appellant in the ensuing weeks. They often spent time together in various social contexts. They shared their personal concerns and struggles and often talked for hours about theological matters.

On the evening of November 12, 2003, A.F. entertained appellant at her apartment. They talked for many hours until early the next morning. The conversation centered on topics of religion and sexuality, including the "theology of the body," a commentary by Pope John Paul II about Roman Catholic views on marriage and sexuality.

The prosecution focused primarily on the events of the next evening, November 13, 2003. A.F. visited appellant at his private quarters in the church rectory at his invitation. It is undisputed that sexual conduct occurred during the course of the evening.

The parties differ as to the next date of sexual conduct in November 2003,[2] but it is undisputed that sexual conduct occurred thereafter about once every two weeks in the course of the next year. The last sexual encounter occurred in February 2005. A.F. first reported the sexual conduct to church officials in early 2005. She ultimately reported the affair to the police in April 2010.

Based on these events, the state charged appellant with one count of third-degree criminal sexual conduct under Minn.Stat. § 609.344, subd. 1($l$)(ii) (2002), for sexual conduct that occurred while the complainant was meeting with the defendant on an ongoing basis for spiritual counsel. The state subsequently amended the complaint to include a second count under subdivision 1($l$)(i) (2002), alleging sexual conduct that occurred during the course of a single meeting in which the complainant sought or received spiritual counsel.

Appellant filed a motion to dismiss the complaint, arguing that the clergy sexual conduct statute was unconstitutional on its face. The district court denied the motion.

Appellant also filed a motion in limine, seeking to prevent the state from adducing evidence of Roman Catholic doctrine. At a pretrial hearing, the state assured the district court that it would not present evidence regarding church doctrine, policy, or remedial action. Based on these assurances, the district court denied appellant's request for an instruction directing the jury not to apply church doctrine or religious law.

Following a trial in November 2011, the jury acquitted appellant of the count alleging sexual conduct when seeking religious advice or assistance in private "during a period of time in which the complainant was meeting on an ongoing basis with the [cleric]." Minn.Stat. § 609.344, subd. 1($l$)(ii). The jury convicted appellant on the later-added count alleging that sexual conduct occurred "during the course of a meeting" where religious advice or assistance was sought or received in private. *Id.*, subd. 1($l$)(i).

## ISSUES

I.  Does the clergy sexual conduct statute violate the Establishment

---

1.  The dates of these confessions are not in the record.

2.  A.F. testified that the second incident of sexual conduct occurred on November 14, 2003. Appellant testified that it occurred around November 27, 2003. Both testified that it occurred in appellant's bedroom at the church rectory.

Clause of the U.S. Constitution on its face?

II. Did the clergy sexual conduct statute, as applied in this case, violate the Establishment Clause?

## ANALYSIS

### I.

■ Whether a statute violates a constitutional provision on its face is a question of law, which this court reviews de novo. *See State v. Netland,* 762 N.W.2d 202, 207 (Minn.2009) (recognizing that constitutional issues are reviewed de novo).

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *See McCreary Cnty. v. Am. Civil Liberties Union of Ky.,* 545 U.S. 844, 852–53 n. 3, 125 S.Ct. 2722, 2729 n. 3, 162 L.Ed.2d 729 (2005).

The United States Supreme Court has interpreted the Establishment Clause to forbid state action that (1) lacks a secular purpose, (2) advances or inhibits religion, or (3) fosters excessive entanglement with religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). The third prong requires courts to apply "neutral principles of law"—that is, "rules or standards that

have been developed and are applied without particular regard to religious institutions or doctrines." *Odenthal v. Minn. Conf. of Seventh–Day Adventists,* 649 N.W.2d 426, 435 (Minn.2002) (quotation omitted).

The Minnesota Supreme Court, without a majority decision on the subject, previously affirmed our determination on the facial validity of the clergy sexual conduct statute. *State v. Bussmann,* 741 N.W.2d 79, 92 (Minn.2007).[3] In *Bussmann,* three justices favored striking down the statute as facially unconstitutional, and three favored upholding it.[4] *See id.* at 84–92, 95. Two of the justices who favored upholding the statute on its face viewed it as a legislative act creating secular standards. *See id.* at 89–92, 95. Writing separately, Chief Justice Russell Anderson similarly declared that the statute set forth secular standards, and concluded that the defendant-priest in that case was essentially tried on a secular question regarding the existence of an ongoing clergy/counselee relationship. *See id.* at 96–100 (Anderson, Russell, C.J., dissenting).

■ The legal effect of the division among the members of the court was a conclusion that "the statute does not facially violate the Establishment Clause." *Id.* at 92. *Bussmann* affirmed the decision of this court, which had relied on *Doe v. F.P.,*

---

3. *Bussmann* addressed subdivision 1(*l* )(ii) of the statute, and appellant was convicted of violating subdivision 1(*l* )(i). *See* 741 N.W.2d at 81. But the issue of constitutionality almost identically affects subdivision 1(*l* )(i), which addresses conduct "during the course of a meeting"; subsection (ii) addresses conduct occurring during meetings held on an "ongoing basis." Minn.Stat. § 609.344, subd. 1(*l* )(i)–(ii). But both prongs require the victim to be seeking or receiving "religious or spiritual advice, aid, or comfort"; thus, the supreme court's analysis of prong (ii) applies equally to prong (i).

4. Justice Hanson, joined by Justices Page and Meyer, authored an opinion concluding that the statute is facially unconstitutional. *See* 741 N.W.2d at 84–89. In a concurring opinion, two other justices joined in the portion of the opinion stating reasons why the statute might be facially valid. *See id.* at 89–92. Justice Paul Anderson wrote the concurring opinion, and Chief Justice Russell Anderson authored a separate dissent. *See id.* at 95–101.

667 N.W.2d 493 (Minn.App.2003), *review denied* (Minn. Oct. 21, 2003). *See State v. Bussmann,* No. A05–1782, 2006 WL 2673294, at *5 (Minn.App. Sept. 19, 2006) (citing *Doe* to hold that "[t]his court has already determined that [the clergy sexual conduct statute] does not violate the Establishment Clause"), *aff'd in part, rev'd in part,* 741 N.W.2d 79 (Minn.2007). In *Doe,* this court considered the constitutionality of the clergy sexual conduct statute in the context of a civil claim based on a violation of that statute. 667 N.W.2d at 495–96. We observed that courts regularly apply secular standards to determine whether a person sought religious advice, aid, or comfort from a member of the clergy in the context of the clergy privilege. *Id.* at 499. Applying a presumption of constitutionality, we concluded that because the statute established neutral principles, its application would not result in excessive entanglement of government and religion in all cases. *See id.* at 499–500.

Thus, *Doe* and the supreme court's divided decision in *Bussmann* hold that the clergy sexual conduct statute does not violate the Establishment Clause on its face. Appellant is not entitled to relief on that basis.

## II.

█ Appellant also argues that the application of the clergy sexual conduct statute violated the Establishment Clause as applied, because his conviction was based on religious evidence regarding Roman Catholic doctrine, internal church policies, and church views of priesthood.

In *Bussmann,* a supreme court majority reversed the defendant-priest's conviction and remanded, holding that the application of the clergy sexual conduct statute under the circumstances of that case violated the Establishment Clause.[5] 741 N.W.2d at 92–95. Characterizing the conviction itself as the relevant state action, the majority concluded that the conviction was "based on" extensive evidence regarding church doctrine. *Id.* at 94. The state "relied heavily" on the evidence; the evidence "bolstered the state's claims"; it was "irrelevant to any secular standard"; and the effect of the evidence was to "engraft[ ] religious standards onto the statute." *Id.* at 92–93. As a result, the conviction was excessively entangled with religion. *See id.* at 94 (using instead the phrase "unavoidably entangled").

The "extensive" religious evidence in *Bussmann* included testimony regarding the following: (i) the power imbalance resulting from "the religious power of priests over parishioners"; (ii) the Roman Catholic Church's official policies regarding pastoral care; (iii) the church's concerns about sexual misconduct involving priests; (iv) the church's response to the allegations of the defendant-priest's sexual misconduct; and (v) the religious training the defendant-priest received. *Id.* at 93–94. Somewhat like what occurred in *Bussmann,* and despite the state's assurances that it would not present evidence on religious doctrine, the following evidence was presented and received in this case: (i) evidence regarding the power imbalance between priests and parishioners, stemming from priests' religious authority; (ii) the Roman Catholic Church's official poli-

---

**5.** The majority opinion, authored by Justice Hanson, spoke for four additional justices with regard to the as-applied violation. Chief Justice Russell Anderson dissented, contending that the evidentiary arguments constituted a due-process/fair-trial issue, not an Establish-

ment Clause question. 741 N.W.2d at 100–01 (Anderson, C.J., dissenting). Chief Justice Anderson concluded that the defendant-priest received a fair trial and that admission of the religious evidence was harmless. *Id.*

cies regarding pastoral care; (iii) the church's doctrines and concerns about sexual conduct involving priests; (iv) the church's response to the allegations of appellant's misconduct; and (v) the religious training appellant received.

Regarding the first category, the prosecutor in this case presented extensive evidence on Roman Catholic doctrine regarding the religious authority of priests over parishioners. On direct examination, the prosecutor elicited testimony regarding the authority of priests as "holy" men who are charged with "the care of souls" and are subject to vows of chastity. A.F. testified that appellant was "called to be a celibate priest and to live out his vocation, and I was called to be a holy woman of God." In cross-examining appellant, the prosecutor inquired about the religious authority of Roman Catholic priests, expounding on the role of priests in "delivering the word of God," performing the "holy" sacraments, interpreting "the meaning of the scripture," preventing parishioners from straying into sin, and offering "absolution" for sins. The prosecutor questioned appellant vigorously regarding his role as a "moral … and spiritual leader" who possessed religious authority over parishioners. During closing argument, the prosecutor contended that A.F. held priests "on a pedestal" because they were "holy men." This evidence was similar to the evidence in *Bussmann* concerning "the power of priests over parishioners." *Cf. id.* at 92–93.

As to the second and third categories, the prosecutor presented evidence regarding the church's policies on pastoral care, Roman Catholic doctrine regarding sexual conduct involving priests, and the church's concerns about priest misconduct. In cross-examining appellant, the prosecutor inquired about the church's moral prohibition on priests engaging in sexual relation-

ships. The prosecutor asked appellant if he was aware that it was "immoral" to have sex with a parishioner because "you took a vow," "you're charged with the spiritual care of people," "parishioners look[ ] up to you as sort of the moral leader at the Church and the spiritual leader," and because "you're there for the spiritual direction of the parishioners." The prosecutor also elicited testimony from a liturgist at appellant's church that "sexual contact between a priest and a parishioner would be something unthinkable." Similarly, the prosecutor elicited testimony from a church staff member about the archdiocese's emphasis on maintaining boundaries with parishioners.

The cumulative effect of this evidence was to establish the Roman Catholic Church's strong moral condemnation of priests who engage in sexual conduct. It further established the church's internal policies on maintaining boundaries in pastoral-care relationships. Like the religious testimony in *Bussmann,* this evidence concerned religious standards for pastoral care, a topic which "presents a serious risk of excessive government entanglement." 741 N.W.2d at 93. And as in *Bussmann,* the evidence here "bolstered the state's claims by informing the jury" that the Roman Catholic Church condemned appellant's behavior. *Id.*

Regarding the fourth category, the prosecutor here presented extensive evidence on the church's response to the allegations of appellant's misconduct. On direct examination, A.F. testified in detail regarding the church's official response to her complaint. She testified that she met with advocates in the archdiocese's program for victims of clergy abuse and wrote a letter to the archbishop detailing the affair. She testified regarding the archbishop's assurances that "certain parameters" had been imposed on appellant to ensure that he

was "getting help." A.F. testified that when she later found out that the archbishop's successor had reassigned appellant to another parish upon determining that he had been rehabilitated, she "was mortified." A.F. testified that, at this point, she felt she "had no other choice" but to go to the police. She testified regarding her motive for doing so: she had given the archdiocese "every opportunity" to properly handle the allegations, but it failed to take sufficient remedial action. In closing argument, the prosecutor reiterated that A.F. only reported the affair to the police because the Roman Catholic Church failed to properly handle the allegations and "simply didn't understand the ramifications." The prosecutor argued that A.F. reported the affair "to save other souls."

The prosecutor also presented testimony from several church officials regarding the church's response to the allegations. A priest responsible for coordinating the church's response to allegations of clergy misconduct testified that he met with appellant in 2005 regarding the allegations of sexual conduct. At the meeting, appellant admitted having an "illicit relationship" with a parishioner. This priest testified that appellant was sent to treatment to "get him back on track as far as his ministry." The archdiocese's victim assistance advocate also testified for the state, describing her meeting with A.F. and detailing A.F.'s allegations. The victim advocate testified that A.F. felt the church did not understand "the seriousness of what happened with her," and that A.F. felt the church should not place appellant "in a position of authority ... in the care of souls."

As in *Bussmann,* this evidence informed the jury that appellant's conduct violated church standards. *Cf.* 741 N.W.2d at 93. As in *Bussmann,* the church was permit-

ted to vouch for A.F.'s credibility through the testimony of church officials, who reiterated her reports and testified regarding the church's remedial actions. *Cf. id.* And as in *Bussmann,* the testimony suggested to the jury that a conviction would be important not only "to assist the Catholic Church in solving the problem of offending priests," but also to hold the church to its own standards, in light of what the state portrayed as a bungled response to A.F.'s allegations. *Id.*

Finally, as to the fifth category, the prosecutor elicited extensive testimony about appellant's religious training. In cross-examining appellant, the prosecutor inquired whether he had taken courses in theology, church doctrine, ministry, ethics, Christian morality, pastoral care, parish ministry, and sexual morality. The prosecutor asked appellant whether he had taken courses "dealing with what is good and bad and with moral obligations and moral duties," whether he had received training in "the conformity of ideals to ... right human conduct," and whether he had been instructed on the role of a priest as "a person in a position of authority" and as someone to whom parishioners would "look up to ... on spiritual matters." The prosecutor inquired, "Part of the job of being a priest is to maintain good moral conduct to set an example for those under you, correct?"

The prosecutor questioned appellant extensively regarding his training on Roman Catholic views regarding sexuality. The prosecutor asked whether appellant had received instruction "about the boundaries between a priest and a lay person," and about how priests are "not supposed to have sex."

The state also elicited testimony from the Roman Catholic official who provided much of the religious evidence in *Bussmann* regarding the seminary training

that priests receive about "boundaries between [priests] and parishioners." *See generally State v. Bussmann*, No. A08–0858, 2009 WL 2015416, at \*2 (Minn.App. July 14, 2009), *review denied* (Minn. Sept. 29, 2009). This official testified that the purpose of this training is to ensure "that the people we serve are safe, so that the clergy treat them with the respect that they deserve, and ... so that the church as a whole is trustworthy." Regarding the content of the training, the witness testified that priests are taught to abstain from sexual contact "with the people under their care."

As in *Bussmann*, the religious evidence provided the jury with religious standards for judging appellant's conduct. It invited the jury to determine appellant's guilt on the basis of his violation of Roman Catholic doctrine, his breaking of the priestly vows of celibacy, and his abuse of the spiritual authority bestowed on Roman Catholic priests; additionally, the evidence invited concern about the response of church authorities to the victim's complaint. *Cf. Bussmann*, 741 N.W.2d at 93. As in *Bussmann*, the evidence on religious topics in this case was excessive. The evidence pervaded the entire trial. *Cf. id.* The prosecutor repeatedly injected Roman Catholic doctrine and practice as a backdrop for underscoring appellant's culpability. *Cf. id.*

The state argues that *Bussmann* is distinguishable because, in that case, the primary source of doctrinal evidence was an expert witness who testified in his official capacity. *See* 741 N.W.2d at 82 (relating

the doctrinal evidence); 2009 WL 2015416, at \*2. Here, through a multitude of witnesses, the state similarly addressed matters of church doctrine. As in *Bussmann*, a church authority testified in his official capacity regarding religious training and internal church policies. *Cf.* 2009 WL 2015416, at \*2. The religious testimony at issue also was elicited from a number of lay witnesses. Given the extent and pervasiveness of the religious evidence in this case, we conclude that the state's distinction is not persuasive.

We appreciate that some of the religious evidence in this case can be characterized as part of the state's effort to prove that A.F. sought and expected to receive religious counsel when she met with appellant on November 13, 2003. Nonetheless, the secular reality of her quest for spiritual counsel could have been established without detailed reference to her understandings regarding the spiritual authority of priests, the degree of appellant's impropriety, and the role of the Roman Catholic Church in connection with his misconduct. As the relevant statute enunciates secular standards, the elements of the offense could have been proven on a secular basis.[6]

Having thoroughly reviewed the record and considered the context of the evidence, we conclude that the religious evidence was excessive. Like the majority in *Bussmann*, we further conclude that the evidence in this case shaped the verdict, thus creating an act of the state—the conviction—that was excessively entangled with religion.[7] *See* 741 N.W.2d at 94. Appel-

---

**6.** For example, apart from any reference to religious doctrine, it is significant that the sexual conduct occurred at the church rectory under the incriminating circumstances that A.F. described and occurred immediately after their initial priest-parishioner relationship.

**7.** In *Bussmann*, Chief Justice Russell Anderson opined in his dissent that the ver-

dict was not unduly tainted by religious evidence because of three considerations: (1) the district court's limiting instructions; (2) the state and defense counsel's closing arguments clarifying that the jury was to apply Minnesota law, not church law; and (3) the parties' focus on the sole issue in dispute—the existence of an ongoing clergy-counselee relation-

lant's conviction was therefore obtained in violation of the Establishment Clause of the U.S. Constitution.

### III.

Appellant asserts four additional issues as grounds for relief, that: (a) he was entitled to an instruction on the primary purpose of the relationship; (b) he was entitled to an instruction on intent with regard to the provision of religious advice, aid, or comfort; (c) he was entitled to an instruction on his theory of the case; (d) the jury verdict violated his right to a unanimous verdict under *State v. Stempf*, 627 N.W.2d 352, 358 (Minn.App.2001); and (e) the district court abused its discretion in excluding expert witness testimony and evidence regarding A.F.'s sexual history.

Because we reverse and remand based on the Establishment Clause violation, the remaining issues must first be considered by the district court on remand, and we presently decline to address them.

### DECISION

Minnesota's clergy sexual conduct statute does not violate the Establishment Clause of the U.S. Constitution on its face. But as applied in this case, the statute resulted in an Establishment Clause violation because appellant's conviction was based on excessive religious evidence.

**Affirmed in part, reversed in part, and remanded.**

---

ship. 741 N.W.2d at 101 (Anderson, C.J., dissenting). Taking these considerations into account, the religious evidence in this case entangled government and religion to an even greater degree than in *Bussmann*. Although the district court provided secular-standard jury instructions, it did not provide any instructions limiting the jury's use of the doctrinal evidence. To the contrary, based on the state's pretrial assurances that it would not present evidence of religious doctrine, the court denied appellant's request for an in-struction directing the jury not to apply Roman Catholic doctrine. Further, in closing argument, the prosecutor referenced religious standards to bolster appellant's culpability. And throughout the trial, the parties did not strictly focus on the secular question of whether A.F. had sought religious aid or counsel from appellant, as the parties did in *Bussmann*. Rather, they strayed into subsidiary issues regarding appellant's violation of Catholic doctrine and his moral culpability under religious standards.